# EXHIBIT A

SUM-100

# SUMMONS
## *(CITACION JUDICIAL)*

*FOR COURT USE ONLY*
*(SOLO PARA USO DE LA CORTE)*

**NOTICE TO DEFENDANT:**
*(AVISO AL DEMANDADO):*
EPIC GAMES, INC., MICROSOFT CORPORATION, AND JOHN DOES 1 - 50.

**Electronically FILED by
Superior Court of California,
County of Los Angeles
4/10/2025 1:00 PM
David W. Slayton,
Executive Officer/Clerk of Court,
By E. Davis, Deputy Clerk**

**YOU ARE BEING SUED BY PLAINTIFF:**
*(LO ESTÁ DEMANDANDO EL DEMANDANTE):*
JENNIFER SAWYER as Guardian ad Litem and on behalf of FAS, a minor.

NOTICE! You have been sued. The court may decide against you without your being heard unless you respond within 30 days. Read the information below.

   You have 30 CALENDAR DAYS after this summons and legal papers are served on you to file a written response at this court and have a copy served on the plaintiff. A letter or phone call will not protect you. Your written response must be in proper legal form if you want the court to hear your case. There may be a court form that you can use for your response. You can find these court forms and more information at the California Courts Online Self-Help Center (*www.courtinfo.ca.gov/selfhelp*), your county law library, or the courthouse nearest you. If you cannot pay the filing fee, ask the court clerk for a fee waiver form. If you do not file your response on time, you may lose the case by default, and your wages, money, and property may be taken without further warning from the court.

   There are other legal requirements. You may want to call an attorney right away. If you do not know an attorney, you may want to call an attorney referral service. If you cannot afford an attorney, you may be eligible for free legal services from a nonprofit legal services program. You can locate these nonprofit groups at the California Legal Services Web site (*www.lawhelpcalifornia.org*), the California Courts Online Self-Help Center (*www.courtinfo.ca.gov/selfhelp*), or by contacting your local court or county bar association. **NOTE:** The court has a statutory lien for waived fees and costs on any settlement or arbitration award of $10,000 or more in a civil case. The court's lien must be paid before the court will dismiss the case.
*¡AVISO!* Lo han demandado. Si no responde dentro de 30 días, la corte puede decidir en su contra sin escuchar su versión. Lea la información a continuación.

   Tiene 30 DÍAS DE CALENDARIO después de que le entreguen esta citación y papeles legales para presentar una respuesta por escrito en esta corte y hacer que se entregue una copia al demandante. Una carta o una llamada telefónica no lo protegen. Su respuesta por escrito tiene que estar en formato legal correcto si desea que procesen su caso en la corte. Es posible que haya un formulario que usted pueda usar para su respuesta. Puede encontrar estos formularios de la corte y más información en el Centro de Ayuda de las Cortes de California (www.sucorte.ca.gov), en la biblioteca de leyes de su condado o en la corte que le quede más cerca. Si no puede pagar la cuota de presentación, pida al secretario de la corte que le dé un formulario de exención de pago de cuotas. Si no presenta su respuesta a tiempo, puede perder el caso por incumplimiento y la corte le podrá quitar su sueldo, dinero y bienes sin más advertencia.

   Hay otros requisitos legales. Es recomendable que llame a un abogado inmediatamente. Si no conoce a un abogado, puede llamar a un servicio de remisión a abogados. Si no puede pagar a un abogado, es posible que cumpla con los requisitos para obtener servicios legales gratuitos de un programa de servicios legales sin fines de lucro. Puede encontrar estos grupos sin fines de lucro en el sitio web de California Legal Services, (www.lawhelpcalifornia.org), en el Centro de Ayuda de las Cortes de California, (www.sucorte.ca.gov) o poniéndose en contacto con la corte o el colegio de abogados locales. AVISO: Por ley, la corte tiene derecho a reclamar las cuotas y los costos exentos por imponer un gravamen sobre cualquier recuperación de $10,000 ó más de valor recibida mediante un acuerdo o una concesión de arbitraje en un caso de derecho civil. Tiene que pagar el gravamen de la corte antes de que la corte pueda desechar el caso.

The name and address of the court is:
*(El nombre y dirección de la corte es):* Los Angeles Superior Court
312 N. Spring Street
Los Angeles, CA 90012

CASE NUMBER:
*(Número del Caso):*
25STCV10619

The name, address, and telephone number of plaintiff's attorney, or plaintiff without an attorney, is:
*(El nombre, la dirección y el número de teléfono del abogado del demandante, o del demandante que no tiene abogado, es):*
Bradley/Grombacher LLP | Kiley L. Grombacher, Esq. 31365 Oak Crest Drive, Suite 240,Westlake Village, CA- (805) 270-7100

DATE: 04/10/2025        David W. Slayton, Executive Officer/Clerk of Court    Clerk, by _____ , Deputy
*(Fecha)*        *(Secretario)*    E. Davis    *(Adjunto)*

*(For proof of service of this summons, use Proof of Service of Summons (form POS-010).)*
*(Para prueba de entrega de esta citatión use el formulario Proof of Service of Summons, (POS-010)).*

[SEAL]

**NOTICE TO THE PERSON SERVED:** You are served
1. ☐ as an individual defendant.
2. ☐ as the person sued under the fictitious name of *(specify):*
3. ☐ on behalf of *(specify):*

   under: ☐ CCP 416.10 (corporation)         ☐ CCP 416.60 (minor)
          ☐ CCP 416.20 (defunct corporation)  ☐ CCP 416.70 (conservatee)
          ☐ CCP 416.40 (association or partnership) ☐ CCP 416.90 (authorized person)
          ☐ other *(specify):*
4. ☐ by personal delivery on *(date):*

**Page 1 of 1**

Form Adopted for Mandatory Use
Judicial Council of California
SUM-100 [Rev. July 1, 2009]

**SUMMONS**

Code of Civil Procedure §§ 412.20, 465
*www.courts.ca.gov*

Electronically FILED by
Superior Court of California,
County of Los Angeles
4/08/2025 6:54 PM
David W. Slayton,
Executive Officer/Clerk of Court,
By G. Carini, Deputy Clerk

**BRADLEY/GROMBACHER, LLP**
Marcus J. Bradley, Esq. (SBN 174156)
Kiley L. Grombacher, Esq. (SBN 245960)
31365 Oak Crest Drive, Suite 240
Westlake Village, CA 91361
Telephone:     (805) 270-7100
Facsimile:     (805) 270-7589
E-Mail:     mbradley@bradleygrombacher.com
E-Mail:     kgrombacher@bradleygrombacher.com


**AYLSTOCK, WITKIN, KREIS
& OVERHOLTZ, PLLC**
S. Mary Liu (CA Bar No. 282884)
17 East Main Street, Suite 200
Pensacola, Florida 32502
Telephone: (850) 202-1010
Fax: (850) 916-7449
Email:     mliu@awkolaw.com
Email:     vgateam@awkolaw.com

*Attorneys for Plaintiffs*

## SUPERIOR COURT OF THE STATE OF CALIFORNIA
## FOR THE COUNTY OF LOS ANGELES

| | |
|---|---|
| JENNIFER SAWYER as Guardian ad Litem and on behalf of FAS, a minor.<br><br>      Plaintiffs,<br><br>  vs.<br><br>EPIC GAMES, INC., MICROSOFT CORPORATION, AND JOHN DOES 1 - 50.<br><br><br>      Defendants. | Case No.: 25STCV10619<br><br>**COMPLAINT FOR DAMAGES**<br><br>1. **Strict Product Liability – Design Defect**<br>2. **Strict Product Liability – Failure to Warn**<br>3. **Negligence – Design**<br>4. **Negligence – Failure to Warn**<br>5. **Common Law Negligence**<br>6. **Statutory Negligence**<br>7. **Intentional Misrepresentation**<br>8. **Negligent Misrepresentation**<br>9. **Fraud**<br>10. **Violations of California's Unfair Competition Law (Cal. Bus. & Prof. Code, §§ 17200 *et seq.*)**<br>11. **Strict Product Liability – Design Defect**<br>12. **Strict Product Liability – Failure to** |

- 1 -
COMPLAINT FOR DAMAGES AND DEMAND FOR JURY TRIAL

**Warn**

13. **Negligence – Design**
14. **Negligence – Failure to Warn**
15. **Common Law Negligence**
16. **Statutory Negligence**
17. **Intentional Misrepresentation**
18. **Negligent Misrepresentation**
19. **Fraud**
20. **Violations of California's Unfair Competition Law (Cal. Bus. & Prof. Code, §§ 17200 *et seq*.)**

**DEMAND FOR JURY TRIAL**
**[UNLIMITED CIVIL CASE]**

## COMPLAINT

Plaintiff F.A.S.  a minor, via their Guardian ad Litem Plaintiff Sharon Litton, hereby brings this action against the above-captioned Defendants (hereinafter collectively referred to as "Defendants"), Epic Games, Inc., Microsoft Corporation,  and DOES 1-50, to recover damages, pursuant to and under the laws of the State of California, arising from the severe injuries sustained because of <u>FAS's'</u> use of Defendants' video game Products. In support thereof, Plaintiff alleges and states:

## INTRODUCTION

1.     Many modern video games are fun and engaging adventures that allow individuals to immerse themselves in the world of games. This litigation is not a war on fun. Nor does it seek to curtail the creation and enjoyment of entertaining video games. Rather, this litigation seeks to hold each Defendant accountable for failing to warn and failing to include available safeguards against the known risks to minors associated with excessive use of their video game products and choosing instead to implement programming that exacerbated these risks to increase their profits.

2.     Defendants are aware that the more time an individual spends playing their respective games and on their platforms, the higher the likelihood that said individuals will make in-game purchases, thereby increasing Defendants' revenues.

3.     Defendants are also aware that for more than four decades, scientists have known

about and studied video game addiction.[1] Furthermore, Defendants are aware that for nearly two decades, science has shown that prolonged use of video games by minors can result in brain damage, cognitive decline, and physical and emotional deficits.

4.    Despite being fully aware of these risks, Defendants marketed their respective games, Fortnite, and Minecraft, and Xbox video game platform[2], (collectively "Products"), to minors without implementing simple safety features, such as adequate parental controls, warnings, or opt-in limits on the time minors can spend in-game.

5.    Instead, Defendants chose to add features to their Products that they knew would be addictive to minors in order to maximize time spent in their respective games and on their platform, thus improving the odds of minors making in-game purchases, and thereby increasing Defendants' profits. Rather than taking necessary steps to mitigate the known risks associated with prolonged exposure of minors to video games, Defendants intensified the problem by causing and profiting from youth addiction.[3]

6.    Defendants' strategies have been extremely lucrative. As a result of Defendants' inclusion of addictive features in their respective Products, they have collectively generated billions of dollars, while causing and/or contributing to a public health crisis for minors suffering from addiction to and disordered use of video games.

7.    While there are countless video games on the market, many with similar game design and warning defects described herein, Defendants and their respective games Roblox, Fortnite, and

---

[1] MD Griffiths; Halley de Oliveira Miguel Pontes, *A History and Overview of Video Game Addiction*, The Oxford Handbook of Digital Technologies and Mental Health (Oct. 8, 2020) https://doi.org/10.1093/oxfordhb/9780190218058.013.2.

[2] Hereinafter, "Xbox platform" collectively refers to all Xbox consoles, including Xbox 360, Xbox One, Xbox One S, the Xbox Network, Xbox Game Pass, Xbox Store, and Xbox Cloud Gaming.

[3] Addiction, as defined in the seminal article *Addictive behaviors: Etiology and Treatment,* published by the American Psychological Association in its 1988 *Annual Review of Psychology*, is:

"a repetitive habit pattern that increases the risk of disease and/or associated personal and social problems. Addictive behaviors are often experienced subjectively as 'loss of control' – the behavior contrives to occur despite volitional attempts to abstain or moderate use. These habit patterns are typically characterized by immediate gratification (short term reward), often coupled with delayed deleterious effects (long term costs). Attempts to change an addictive behavior (via treatment or self-initiation) are typically marked with high relapse rate."

Minecraft have unique impacts on minors. As explained below, Defendants' marketing strategies specifically target youth. Accordingly, Defendants' games – Fortnite, and Minecraft – are often among the first online video games children play and the catalyst to an addiction cycle and disordered relationship with video games.

8.     Defendant Microsoft's Xbox video game platform is often where these games are played. As described herein, Defendant Microsoft designed its Xbox platform with game-like features that caused and further exacerbated addiction and disordered relationships with video games.

9.     As set forth below, because of Defendants' marketing efforts, Fortnite, and Minecraft were among the first online video games played by Plaintiff FAS Plaintiff FAS played these games on Microsoft's Xbox platform. As each Defendant expected and intended from their decision to add addictive and manipulative programming to their Products instead of safety features, FAS became addicted to Roblox, Fortnite, and Minecraft and developed a disordered relationship with video games. As a result, FAS suffers from severe physical, emotional, and economic injuries, including diminished social interactions, lack of interest in other hobbies, and withdrawal symptoms such as rage, anger, and physical outbursts. Through this lawsuit, FAS seeks to hold Defendants accountable for their decisions to place profits over safety, which directly and proximately resulted in FAS's significant harm.

10.     The true names and capacities of the Defendants, DOES 1-50, are unknown to Plaintiffs at the time of filing this Complaint and Plaintiffs, therefore, sue said Defendants by fictitious names and will ask leave of court to amend this Complaint to show their true names or capacities when the same have been determined. Plaintiffs are informed and believes and thereon alleges that each of these fictitiously named Defendants are responsible in some manner for the occurrences alleged herein, and that Plaintiff's injuries and damages as alleged and set forth herein were proximately caused by such fictitiously named Defendants.

**PARTIES**

**I.    Plaintiff Jennifer Sawyer**

11.     Plaintiff Jennifer Sawyer is, and at all times relevant to this action was, a citizen and resident of the State of California whose principal place of residence is Woodland Hills, California.

- 4 -

12. Plaintiff Jennifer Sawyer is the mother of FAS and she serves as FAS's Guardian ad Litem and representative in this lawsuit.

## II. Plaintiff FAS

13. Plaintiff FAS, a minor, is, and at all times relevant to this action was, a citizen and resident of the State of California with a principal place of residence located in Woodland Hills, California. FAS is 12 years old at the time of filing this lawsuit.

14. FAS began playing video games and using Defendants' Products at approximately 6 years old. Since that time, FAS has used and/or continues to use Defendants' Products at an increasing, uncontrollable, compulsive, and/or addictive pace. FAS has been injured and damaged, and continues to be injured and damaged, as a result of FAS's use of, and addiction caused by FAS's use of, Defendants' defective Products.

## III. Defendant Epic Games, Inc.

15. Defendant Epic Games, Inc. ("Epic Games") is a Maryland corporation with its principal place of business at 620 Crossroads Blvd, Cary, North Carolina 27518.

16. Epic Games is a video game developer and publisher that, at all times material hereto, designed, developed, tested, patented, assembled, manufactured, published, packaged, labeled, prepared, distributed, marketed, supplied, and/or sold the Fortnite video game series and platform, either directly or indirectly, to members of the general public within the State of California, including to Plaintiff FAS.

## IV. Defendant Microsoft Corporation

17. Defendant Microsoft Corporation ("Microsoft") is a Washington corporation with its principal place of business at One Microsoft Way, Redmond, Washington 98052.

18. Microsoft is a video game developer and publisher that, at all times material hereto, designed, developed, tested, patented, assembled, manufactured, published, packaged, labeled, prepared, distributed, marketed, supplied, and/or sold the Minecraft video game series and platform, either directly or indirectly, to members of the general public within the State of Louisiana, including to Plaintiff TKL.

19. At all times material hereto, Microsoft designed, developed, tested, patented,

COMPLAINT FOR DAMAGES AND DEMAND FOR JURY TRIAL

1    assembled, manufactured, packaged, labeled, prepared, distributed, marketed, supplied, and/or sold

2    the Xbox Platform – on which Roblox, Fortnite, and Minecraft could be played – to members of the

3    general public within the State of California, including to Plaintiff FAS.

4         20.     Microsoft has played a direct role in changes made to the design, development, testing,

5    assembly, manufacture, publishing, packaging, labeling, preparation, distribution, marketing, supply,

6    and/or sale the Minecraft video game series that Plaintiff FAS began playing. Indeed, Microsoft is

7    responsible for the addictive design features in Minecraft described herein. Microsoft has direct

8    liability for the harm and injuries caused by Minecraft based on their own conduct.

9                              **JURISDICTION AND VENUE**

10        21.     Plaintiff FAS realleges and incorporates by reference all of the foregoing allegations

11    as if repeated in full here.

12        22.     This suit alleges causes of action seeking relief arising under the laws of the State of

13    California, including but not limited to the allegation that as a direct and proximate result of

14    Defendants' Products and Defendants' negligent, deceptive, willful, immoral, reckless, and unlawful

15    actions and inactions, representations and misrepresentations, including by omission, Plaintiff FAS

16    suffered and continues to suffer injuries and damages within the State of California caused by the

17    acts of a California business.

18        23.     This Court has personal jurisdiction over Defendants Epic Games,  and Microsoft,

19    because these Defendants routinely conduct business in California and have sufficient minimum

20    contacts in California, stemming from their activities whereby they have purposefully and

21    intentionally availed themselves of this jurisdiction and the benefits and protections of the laws of the

22    State of California by marketing video game Products and transacting business in the State of

23    California. Next, Epic Games's registered agent for service of process is in California at CT

24    Corporation System - 330 N Brand Blvd., Glendale, California, 91203. Microsoft also has a registered

25    agent for service of process in California at Corporation CSC – 2710 Gateway Oaks Drive,

26    Sacramento, California 95833. Further, the controversy reflected in this action is directly affiliated

27    with, related to, and arises from each Defendant's contacts with the State of California. Plaintiff FAS

28    is from the State of California and as a result of each Defendant's contacts with California, Plaintiff

1    purchased and/or downloaded each Defendant's game and Microsoft's Xbox Platform in California,

2    Plaintiff played each Defendant's game and used subsequently developed an addiction to their

3    respective games in California, and Plaintiff suffered severe harm as a result in California.

4         24.    Venue is proper in this County because the Plaintiff maintains her residence in Los

5    Angles County and the harm alleged above occurred and accrued in Los Angeles County.

6                        **GENERAL FACTUAL ALLEGATIONS**

7         25.    In 2023, 65% of Americans of all ages played video games every week.[4] In 2024,

8    experts reported that roughly 85% of teenagers say they play video games, with 97% of boys and

9    73% of girls reporting video game usage.[5] Further, more than 90% of children older than two years

10   old play video games, and "[c]hildren 8 to 17 years of age spend an average of 1.5 to 2 hours daily

11   playing video games."[6] This research dramatically emphasizes the idea that video game usage has

12   become fundamental in the life of an American child.

13   **I.    Extensive Video Game Usage Damages Adolescent Brains**

14        26.    For almost two decades, research on the interaction between video game usage and

15   the adolescent brain has shown that extensive usage has a severe impact on the adolescent brain,

16   including loss of grey matter, which leads to severe physical and mental effects on the child. Many

17   of these effects are indicators or consequences of Internet Gaming Disorder ("IGD"), which is the

18   addiction to video gaming.

19        27.    Research on the impacts of video game usage includes studies about the role dopamine

20   plays in the brain during gameplay.

21        28.    Video games can and do cause an intense dopamine release in the user that is similar

22   in magnitude to that experienced by substance abuse or gambling. Dopamine is a neurotransmitter

23   made in the brain that acts as a chemical messenger that communicates messages between nerve cells

24

25   [4] Crosby Armstrong, *Video Games Remain America's Favorite Pastime With More Than 212 Million Americans Playing Regularly*, Ent. Software Ass'n (Jul. 10, 2023),

26   https://www.theesa.com/video-games-remain-americas-favorite-pastime-with-more-than-212-million-americans-playing-regularly/.

27   [5] Jeffrey Gottfried & Olivia Sidoti, *Teens and Video Games Today*, Pew Res. (May 9, 2024), https://www.pewresearch.org/internet/2024/05/09/teens-and-video-games-today/.

28   [6] Daniel Alanko, *The Health Effects of Video Games in Children and Adolescents*, Pediatr. Rev. (Jan. 1, 2023).

in the brain, as well as between the brain and the body. Dopamine serves as the brain's all-important "reward center" and, in addition, plays a critical role in several body functions including attention, mood, pleasurable reward and motivation, sleep, learning, and movement. The release of dopamine causes demonstrable physical, mental, and emotional responses in the human brain and body. This is especially true in minors, and particularly neurodivergent minors, whose brains are still developing. Increased frequency of dopamine releases can lead to withdrawal symptoms, including anger, irritability, or physical outbursts when the game is made unavailable.

29.     The repetitive release of dopamine creates, reinforces, and strengthens a dysregulated or dopaminergic neural pathway that propels the user to hyperfocus on using the video games more and more, first at an increasing rate and then with compulsive desire until the impulse to use the video games develops into a disordered use or addiction.

30.     Those dysregulated neural pathways trigger addictive, compulsive, and impulsive behaviors outside of the gaming world consisting of life-altering impulsivity and inhibitory control behaviors that can and do cause a myriad of catastrophic physical, mental, and emotional disorders, symptoms, and injuries, including other addictions, significant withdrawal symptoms, maldevelopment of the brain's frontal lobe, dissociative behaviors, social isolation, damage and/or negative consequences to cognitive processes, attention disorders, severe depression, morbid obesity, mal and/or undernutrition, and other harmful effects, all to the severe detriment and damage to the minor, and to the severe emotional detriment and pecuniary or economic damage to their families and caretakers.

31.     Additional video game research reports the physical changes to the brain and brain matter as a result of gameplay.

32.     Research has shown that prolonged use of video games damages the prefrontal cortex of the user, causing a loss of grey matter, lower cognitive function, and an inability to regulate impulse control. Research has also concluded that such use of video games may lead to negative effects like stress, aggressive behavior, verbal memory deficiency, depression, lowered cognitive abilities, sleeping disorders, anxiety, and behavioral addiction disorders.

COMPLAINT FOR DAMAGES AND DEMAND FOR JURY TRIAL

33.    Clinical evidence has shown that users addicted to online games experience biopsychological symptoms and complications, including symptoms traditionally associated with substance abuse and addiction, such as hangovers, changes in mood, ability to adapt, withdrawal, conflict, and recurrence symptoms.

34.    Empirical studies indicate that gaming disorders are associated with detrimental health-related outcomes.

35.    Brain imaging studies have shown that excessive use of video games negatively affects the brain regions responsible for reward, impulse control, and sensory-motor coordination.

36.    Other studies have shown that disordered and/or excessive use of video games leads to negative consequences on cognitive processes, including multi-second time perception, inhibition, and decision-making.

37.    During adolescence, the prefrontal cortex—the locus of judgment, decision-making, and impulse control—is still developing and undergoing major reorganization. This region of the brain does not reach maximum capacity until the age of 25 to 30. The executive control center of the prefrontal cortex is essential to one's ability to healthfully weigh risks and rewards and for pausing the pursuit of immediate rewards in favor of more adaptive longer-term goals. The lack of full development of the prefrontal cortex is arguably why young people are more likely to engage in hours of use while ignoring basic needs like food, sleep, and hygiene. Without mature frontal lobes, minors are less able to weigh potential negative consequences and curb potentially harmful behavior like excessive use of video games, which further impacts frontal lobe development.

38.    Brain imaging studies related to IGD have shown structural changes in the brain, particularly a reduction in white-matter density (consisting mostly of cells and axons that transmit signals from the cerebellum to other brain regions) and grey-matter volume (associated with emotions,



- 9 -
COMPLAINT FOR DAMAGES AND DEMAND FOR JURY TRIAL

perception, memory, and motor control). Specifically, studies showed several regions of the brain demonstrated reduction in grey-matter volume in gaming disorder participants, as depicted here:[7]

39.     Brain activation studies have shown that the use of video games causes changes in the reward and impulse control regions of the brain, and that engaging with video games activates regions of the brain in a manner similar to the way the brain is activated in response to cue-exposure to drugs (whereby addicts are exposed to relevant drug cues to extinguish conditioned responses).

40.     Additional brain activation studies have shown that individuals with gaming disorders have impaired inhibitions, and that video game cues activate craving, attention, and executive function areas of the brain. Those cognitive, sensory-motor, and emotional processes may be associated with long-term changes to the brain because of prolonged use of video games. Regions that showed activation in response to video game cues in gaming disorder participants in more than two studies are depicted in the following image:[8]



41.     Structural studies of the brain have shown alterations in the volume of the ventral striatum (a critical component of motor and reward systems in the brain) are possible because of changes in reward regions of the brain. One comparison study of young adults with a mean age of 24 revealed that individuals who engage in excessive use of video games tend to have lower cognitive function, particularly in areas of verbal ability and working memory.

42.     Research has shown that a neurodivergent minor with a diagnosis of Attention-Deficit Hyperactivity Disorder ("ADHD") or Autism Spectrum Disorder is at a higher risk of developing video game disorder or addiction, which can worsen one's ability to control impulsivity and result in

---

[7] Livny, Weinstein, and Weizman, *New Developments in Brain Research of Internet and Gaming Disorder*, 75 Neurosci. Biobehav. Rev. 314 (Apr. 2017).

[8] Aviv Weinstein et al., *Neurobiological Mechanisms Underlying Internet Gaming Disorder*, 22(2) DIALOGUES CLIN. NEUROSCI. (2020).

COMPLAINT FOR DAMAGES AND DEMAND FOR JURY TRIAL

brain damage.[9] Research has shown that while use of video games may foster creativity in some minors, such potential benefits are outweighed by the risk of developing addiction or disordered use of video gaming products, which typically develops swiftly in minors and neurodivergent individuals. This is particularly true when the video games incorporate addictive and manipulative tactics, as well as other problematic psychological programing.

**II.    Gaming Addiction Is A Recognized and Diagnosable Condition**

43.    Addiction to and disordered use of video games and internet gaming is a recognized, diagnosable mental disorder and form of behavioral addiction codified by the American Psychiatric Association's 2013 Diagnostic and Statistical Manual of Mental Disorders (DSM-5).[10] The diagnostic symptoms of internet gaming disorder currently set forth in DSM-5 include: (1) Preoccupation with playing and/or using video games; (2) Withdrawal symptoms (sadness, anxiety, irritability, and/or other unpleasant symptoms) when access to play and/or use is removed, precluded, or reduced; (3) Tolerance - the need to spend more time playing and/or using video games to satisfy the urge and desire to do so; (4) Loss of Control or the inability to reduce video game playing and usage time and/or unsuccessful attempts to quit gaming; (5) Giving up other activities or loss of interest in previously enjoyed activities due to compulsion to play video games; (6) Continuing to play and use video games despite negative or problematic consequences; (7) Deceiving family members or others about the amount of time spent playing and/or using video games; (8) Using video games to "escape" or relieve negative moods, such as guilt or hopelessness; and (9) Jeopardized school or work performance or relationships due to playing and/or using video games.

44.    Nationally recognized institutions such as the Cleveland Clinic and the National Center for Biotechnology Information (NCBI) also recognize video game addiction and categorize the addiction as falling under the general category of IGDs.[11]

---

[9] Micah O. Mazurek & Christopher R. Engelhardt, *Video Game Use in Boys with Autism Spectrum Disorder, ADHD, or Typical Development*, 132 Am. Acad. of Ped. J.L. 2 (2013).
[10] It is also recognized in the recently released Diagnostic and Statistical Manual of Mental Disorders, Text Revision (DSM-5-TR).
[11] Shabina Mohammad, Raghad A Jan, & Saba L Alsaedi, *Symptoms, Mechanisms, and Treatments of Video Game Addiction*, Cureus (Mar. 31, 2023).

45.     As of 2022, "Gaming disorder"—disordered use of and/or play with video games—is a recognized mental health disorder by the World Health Organization and International Statistical Classification of Diseases and Related Health Problems. "Gaming disorder" is included within the subcategory "ICD-11" entitled "Disorders due to substance use or addictive behaviors."[12] "Gaming disorder" is defined in the 11th revision of the International Classification of Diseases as a pattern of persistent or recurrent gaming behavior, specifically "digital gaming" or "video-gaming," which may be online or offline, manifested by: impaired control over gaming (e.g., onset, frequency, intensity, duration, termination, context); increasing priority given to gaming to the extent that gaming takes precedence over other life interests and daily activities; and continuation or escalation of gaming despite the occurrence of negative consequences.

**III.   Historical Development and Modernization of Video Games**

46.     The term "video game" is defined by California Civil Code §§ 1746-1746.5 as "any electronic amusement device that utilizes a computer, microprocessor, or similar electronic circuitry and its own monitor, or is designed to be used with a television set or a computer monitor, that interacts with the user of the device."

47.     Video games were first developed in or around the 1950s.

48.     Initially, games were only available to be played by the general public in arcades. Beginning in the 1970s, however, the first at-home video game devices ("consoles") appeared on the market.

49.     By the late 1990s and early 2000s, there were multiple at-home video game consoles, such as Xbox, PlayStation, and Nintendo's Wii, making video games easily accessible to most users from the comfort of their living room. Over the next ten years, video games moved to mobile devices and tablets, once again increasing accessibility to gameplay.

50.     Many video games – including  Fortnite, and Minecraft – can now be played on multiple different consoles, mobile devices, and tablets.

---

[12] Other disorders found in that subcategory include alcoholism and gambling addiction.

51.     Moreover, video games can be delivered to these consoles, mobile devices, and tablets in several diverse ways, such as physical discs, digital downloads, online gaming networks, and cloud gaming services.

52.     In 2024, there are 1.17 billion gamers online, and global gaming revenues are at least $176.06 billion.[13]

53.     As the sophistication of gaming devices and game delivery methods has increased, so too has the sophistication of the design of games themselves.

54.     Unlike their predecessors, many modern-day games are enormous in scale, providing countless hours of non-repetitive, unique gameplay that allows players to become immersed in the world of the game.

55.     The ways in which game developers monetize their games have also changed over time. In the past, game developers earned revenue primarily through the one-time sale of their games. Although some game developers still follow this model, others – including Defendants – allow their games to be downloaded for no or minimal cost and generate revenue through purchases made within the game.

56.     In-game purchases can include, but are not limited to, cosmetic customizations for the player's character (*e.g.*, hats, uniforms, hair styles), "boosters" that help their character perform better or progress faster within the game, and "season passes" that allow players to access exclusive in-game content.

57.     Many of these in-game purchases are relatively low cost, leading to them being termed "microtransactions."

58.     In-game items available for purchase are often heavily advertised to players through means such as in-game pop-up advertisements during gameplay, loading screens while users wait for gameplay to start, and in-game stores.

59.     Many games also offer game-branded products such as toys, energy drinks, apparel, bedding, home goods, board games, and more.

---

[13] Jasmine Katatikarn, *Online Gaming Statistics and Facts: The Definitive Guide (2024)*, Acad. of Animated Art (Jan. 16, 2024), https://academyofanimatedart.com/gaming-statistics/.

60.     Game developers that offer their games at no or low cost, such as Fortnite, and Minecraft, rely on these microtransactions to turn a profit. Indeed, the design and marketing strategy associated with such games is rooted, in part, in the theory that the revenue from the on-going microtransaction system will outweigh the revenue from a one-time-purchase game. That is because microtransaction spending can easily add up to hundreds, or even thousands, of dollars from an individual user.

61.     Accordingly, modern gaming companies are enlisting PhD behavioral psychologists and using research to implement programming into their games that will addict players with a goal of increasing the amount of time spent in game, thereby prolonging their exposure to in-game marketing for in-game purchases in order to improve the odds players will engage with microtransactions that generate profits for the game developer.

## IV.   Psychological Techniques and Programming Choices Game Developers Use to Create Addiction, Drive Microtransactions, and Increase Profits.

### A.   Operant Conditioning

62.     Modern game developers, including Defendants, employ(ed) and/or consult(ed) with child development experts and/or psychologists to assist with the design and development of their games and/or gaming platforms, and to analyze the effects of game design on user behavior.

63.     Upon information and belief, modern game developers, including Defendants, knew that minors were engaging with their Products and utilized their child development experts and/or psychologists to design their games to attract and addict minors to their Products.

64.     Upon information and belief, the analyses performed by each Defendant's behavioral experts and/or psychologists revealed that when video games that are programmed to incorporate "operant conditioning" that targets users' dopamine receptors, the operant conditioning triggers users' desire to hyperfocus on using and overusing the Products.

65.     "Operant conditioning" is a form of behavioral manipulation that uses rewards and punishments to influence behavior. Through operant conditioning, rewarded behavior is likely to occur more frequently, while the frequency of punished behavior decreases.

66.     In the context of video games and gaming platforms, video game developers including Defendants, relied upon these psychological analyses to program their games and platforms to employ operant conditioning in order to addict players and manipulate them into making profitable decisions for the game developers, such as spending more time playing their respective games and engaging in microtransactions.

**B.     Development and Use of Patented Programming**

67.     In addition to relying on their own studies to make programming decisions, game developers, including Defendants, helped develop, licensed, and otherwise utilized patented programming algorithms in their games and gaming platforms that were intended to addict players, increase time spent in-game, and drive microtransactions. By way of example:

a.  U.S. Patent No. 20160005270-A1, is a "matchmaking" patent that uses historical player data and analytics to create a system for driving microtransactions in a multi-player game. This "matchmaking" patent is used in Products, like Defendants' at issue here, and can be summarized as a "system and method … that drives microtransactions in multiplayer video games. The system may include a "microtransaction arrange match[] to influence game-related purchases. For instance, the system may match a more expert/marquee player with a junior player to encourage the junior player to make game-related purchases of items possessed/used by the marquee player. A junior player may wish to emulate the marquee player by obtaining weapons or other items used by the marquee player." The system for driving microtransactions is comprised of a host computer having one or more physical processors programmed with computer program instructions that, when executed by the one or more physical processors, cause the host computer to: identify an in-game item that is relevant to a first player, but not yet possessed by the first player for gameplay in a multi-player game; identify a second player that possesses the in-game item; and match the first player and the second player to play in a gameplay session to encourage purchase of

the in- game item by the first player, wherein the matching is based on: (i) the relevance of the in-game item to the first player, and (ii) the possession of the in-game item by the second player. This system is further programmed to determine that the first player has purchased the in-game item in relation to the gameplay session; determine a subsequent gameplay session that caters to use of the in-game item; and match the first player to play in the subsequent gameplay session to encourage future purchases.

b.  U.S. Patent No. 9623335-B1 utilizes a "user spend parameter value" to "determine which users should be provided with access to an exclusive virtual section of the online game," such as a virtual shop "present[ing] high-end, or expensive virtual items." This prevents the game from losing the opportunity "to extract additional value from users inclined to spend money."

c.  U.S. Patent No. 9138639-B1 creates a dynamic pricing system which modifies the "pricing of in-game virtual items associated with [players'] experience and their progress in the game." In this way, "while all players may receive a message for a particular item, the cost for each player may be more or less than other players based on the individual's in-game statistics."

d.  U.S. Patent No. 9795886-B1 allows new users to purchase in-game support more cheaply than experienced users. Particularly, the system determines "prices for a protection extension in an online game" based on "the user's power and/or strength in a game." This allows a less experienced player to "build up their strength in a game, thus promoting further player engagement."

e.  U.S. Patent No. 9403093-B2 is a "dynamic" pricing patent that encourages users to make purchases on multiple game devices or platforms by providing incentives for such "cross platform game play." In particular, "[t]he system may monitor the player's performance on a particular console and provide incentives to accomplish tasks through game play on a different platform than

COMPLAINT FOR DAMAGES AND DEMAND FOR JURY TRIAL

the player is currently operating to play the game."

    f.   U.S. Patent No. 9626475-B1 creates an exclusive, time-limited, event-based currency. During such an event, players may acquire a second type of virtual currency in addition to other forms of virtual currency. The event-based currency may be purchased with real-world money, and after the event, the event-based currency may become unusable by or unavailable to the users.

    g.   U.S. Patent No. 9666026-B1 provides offers that "decrease in value based on previous acceptances of the offers" in order to create a sense of urgency in relation to the virtual items. Offers provided "may include a first offer having a first value that progressively decreases based on an amount of users that have previously accepted the first offer in order to incentivize early acceptance of the first offer."

    h.   U.S. Patent No. 9808708-B1 adjusts "virtual item bundles made available to users of an online game based on user gameplay information." This allows the game to increase the price of an item bundle for a user with less cost sensitivity associated with items that the user enjoys.

68.    Upon information and belief, many game developers, including each Defendant, license one or more of the above technology patents, and/or other patents similar thereto, and incorporate said technology into their respective Products with the intention of creating addiction and profits.

**C.**    **Operant Conditioning, Patented Technology, and Game Design Choices Increase Time Spent In-Game and Revenue Generated by Microtransactions.**

69.    Using operant conditioning and patented technology, video game developers, including Defendants, analyze the skill level and behavior of the user and customize their experience to maximize the time spent in-game, during which the user is bombarded with solicitations to purchase additional in-game downloadable game content.

70.    In so doing, video game developers, including Defendants, exploit an information asymmetry between themselves and the user. This allows game developers, including the Defendants,

COMPLAINT FOR DAMAGES AND DEMAND FOR JURY TRIAL

to use their knowledge of the user's skill, game-related preferences, available funds, and/or playing and spending habits to present in-game downloads and purchase offers that are predetermined to maximize a user's expenditure of real money.

71.    For example, in some instances, video game developers, including Defendants, increase the difficulty of the game as the player's skill increases, thereby increasing the amount of time it takes for the player to achieve repeated success. During the extra time it now takes for the player to achieve success, the player is exposed to repetitive advertisements for desirable in-game items that can be obtained through points earned over time through continued and prolonged gameplay or instantaneously using in-game or real-world currency.

72.    Likewise, game developers, including Defendants, may offer "season passes" in which players can pay real-world money to obtain access to exclusive items that are available to be purchased for a limited time through points earned during game play. Game developers incentivize players that have purchased "season passes" to engage in prolonged game sessions during the "season" to earn sufficient points to collect each exclusive item. Once again, however, by design game difficulty is dynamic resulting in players needing to play longer to obtain the results they desire, all while being exposed to advertisements for additional in-game products.

73.    Critical to each Defendant's revenue, such continued schemes with little to no restriction on the amount of spending in the payment interface also makes it easy for minor users to fail to understand the value of the actual money being spent which allows for more easeful and continuous spending of real money.

74.    These and other schemes—all of which the Defendants knowingly incorporate into the design features of their respective Products—use psychological mechanisms, behavioral psychology, and neuroscience to encourage repeated use and increased spending by users, especially minors who are vulnerable to these tactics and which serve to deepen their disordered or addicted use.

V.    Addictive Game Design Features Cause Significant Harm to Minors

75.    The human population most vulnerable to the combination of game developers' microtransaction methodology and addictive operant conditioning design features are minors; minors

who are neurodivergent are even more susceptible to becoming addicted. Video game developers, including Defendants, knew this, but nonetheless purposefully designed their games to exploit that vulnerable population, causing injury and detriment, including to Plaintiff FAS. Doing so has yielded the intended results: video game developers, including Defendants, have earned extraordinary financial revenue from this group of users as a result of placing their addictive Products that are targeted to minors into the stream of commerce.

76. Each Defendant knew or was aware, or should have known and should have been aware, that their respective Products were dangerous and harmful to users, particularly minors, when used as intended and in a reasonably foreseeable manner. In fact, each Defendant intentionally caused and designed their respective Products to most effectively cause users with developing brains to become addicted or disordered in their desire to use the Products. To that end, upon information and belief, each Defendant employed behavioral psychologists and/or neuroscientists to develop Products that incorporated design features premised upon psychological tactics engineered to keep users engaged in using the Products for longer and longer periods of time.

77. The microtransactions and other technologies, designs, features, mechanisms, algorithms, artificial systems, programs, and other processes each Defendant incorporated into their Products were implemented in a manner such that users (and, when users are minors, their caretakers) do not understand and have no way of understanding (or uncovering through reasonable diligence) that their use of the Products involves engagement with intentionally addictive design features that are physically damaging to their brains and bodies, and financially rewarding to the Defendants.

78. There is no meaningful disclosure of the addictive mechanisms and microtransactions in each Defendant's Products at the time they are purchased to allow prospective users to make informed decisions as to whether using the Products are desirable, appropriate, safe, or worth the potential risk.

79. At all times material hereto, each Defendant targeted consumers/purchasers, including minors, and specifically including Plaintiff FAS herein, to use their respective Products and engage in microtransactions whereby in-game perks are exchanged for real money through in-game targeted solicitations.

COMPLAINT FOR DAMAGES AND DEMAND FOR JURY TRIAL

80.     Each Defendant, with knowledge of FAS's age and California residency, targeted Plaintiff FAS with manipulative programming to prolong use of their Products in hopes of inducing FAS to engage in microtransactions during their use of the Products. As a result of FAS's use of each Defendant's Products, and because of the addictive design features incorporated into the Products, FAS was injured and damaged as herein alleged.

> **How is an Age Recommendation determined?**
>
> Roblox's age recommendations are grounded in child development research and informed by industry standards. To determine which audiences an experience is generally suitable for, we examined global industry standards and consulted child development experts.

## VI.   Fortnite

### A.   Fortnite Gameplay Basics

81.     Fortnite is an online video game and game platform designed, developed, and published by Epic Games.

82.     Fortnite is free to play, making it easily accessible to all users, including minors.

83.     Fortnite was first released in 2017 and is now available in three distinct game mode versions that share the same general design and engine.

84.     Fortnite: Battle Royale is a free-to-play battle royale game in which up to 100 users fight in a progressively shrinking arena to be the last person standing. Users can play alone, in a duo, or in a "squad" of 3-4 players. When users land "inside the game," the user must scavenge for weapons, items, resources, and vehicles while trying to stay alive, attack, and eliminate other users. Battle Royale is frequently Fortnite's most popular game and is the game mode to which many attribute Fortnite's success.[14]

85.     Fortnite: Save the World is a cooperative hybrid tower defense-shooter and survival game in which up to four users fight off zombie-like creatures and defend objects with traps and fortifications they can build. Users are awarded a number of in-game items from and during missions, including hero characters, weapon and trap schematics, and survivors, all of which can be leveled up

---

[14] The Week Staff, *What is Fortnite and Why is it So Popular?*, The Week, https://theweek.com/93700/fortnite-battle-royale-news (Aug. 3, 2018).

through gained experience to improve their attributes. Save the World is the only pay-to-play game mode of the Fortnite franchise.

86.    Fortnite Creative is a sandbox game mode in which users are given complete freedom to create worlds by spawning any item from Battle Royale on a personal island and can create games such as battle arenas, racecourses, platforming challenges, and more.

87.    Each of Epic Games's herein listed Fortnite Products has similar graphics, art assets, and game mechanics.

88.    Fortnite has an average of 239 million monthly players and a peak of 15 million players in a day.[15]

89.    Less than two years after Fortnite's release, the games had generated over $9 billion in revenue through microtransactions and in-game purchases. In 2021 alone, Fortnite generated $5.8 billion in revenue.[16]

90.    Fortnite game Products are monetized using V-Bucks: in-game currency that can be purchased with real-world funds or earned through completing missions and other achievements in Save the World.

91.    Fortnite includes a feature called a "Battle Pass," which is the same feature as a "season pass" as described above. Compl. ¶ 78. The Battle Pass in Fortnite allows players to earn various rewards by "levelling up" the Pass. Levelling up can be done by earning medals during gameplay, completing challenges, and purchasing the levels with V-Bucks.[17] The purpose of the Battle Pass is to keep players engaged in hours of gameplay trying to earn rewards, and to increase profits for Epic Games through the purchase of in-game content.

---

[15] This statistic is as of July 2023. *Fortnite Player Count: How Many People Play the Game?* The Econ. Times (Jul. 14, 2023), https://economictimes.indiatimes.com/news/international/us/fortnite-player-count-how-many-people-play-the-game/articleshow/101767141.cms?from=mdr.

[16] Sunil Gill, *Fortnite Revenue, Player Count & Net Worth 2024*, Priori Data (Apr. 1, 2024), https://prioridata.com/data/fortnite-statistics/.

[17] *What is the Battle Pass? Where Can I Learn More?*, Fortnite Support, https://www.epicgames.com/help/en-US/c-Category_Fortnite/c-Fortnite_Gameplay/what-is-the-battle-pass-where-can-i-learn-more-a000084706 (last visited Sept. 3, 2024).

**B.** **Fortnite's Youth-Focused Partnerships Contradict Game Rating but Increase Profits**

92.     Fortnite's Battle Royale and Save the World are rated T for Teen, *i.e.,* recommended for individuals aged 13 and above. This does not mean younger children cannot use them or that Epic Games does not know that children under 13 are using Fortnite Products. Rather, Epic Games is aware and markets Fortnite to consumers of all ages, and particularly to minors.

93.     Despite its T rating, survey results from 2019 show that 53% of U.S. children aged 10-12 played Fortnite weekly, compared to 33% of U.S. teens aged 13-17.[18]

94.     Even though most Fortnite games are rated T, Fortnite (specifically Battle Royale) has engaged in numerous in-game virtual collaborations with child-friendly entities such as Disney, LEGO, Marvel, NERF, Air Jordan, DC Comics, PAC-MAN, the NFL, Ninja, Rocket League, Ghostbusters, Star Wars, TRON, Neymar Jr., the NBA, LeBron James, Ariana Grande, Naruto, Naomi Osaka, Indiana Jones, Dragon Ball, Spiderman, Batman, TikTok, The Nightmare Before Christmas, Wreck-It Ralph, Lewis Hamilton, Teenage Mutant Ninja Turtles, Nike, Pirates of the Caribbean, and more.[19]

95.     Most, if not all, of these collaborations are geared towards a wide audience that unmistakably includes minors under the age of 13. Many young children watch Disney movies, play with LEGOs, or listen to the music of pop stars like Ariana Grande. Epic Games is explicitly and intentionally marketing its Fortnite games to young children by collaborating with the above entities.

96.     Not only does Epic Games engage in in-game collaborations, but they also have physical merchandise they produce or sponsor, most of which are toys or children's items. For example, Fortnite creates plastic toy loot boxes and battle boxes, action figures, NERF guns, trading cards, board games, motorized toy cars, LEGO sets, and Halloween costumes. Fortnite has partnered with children's toymakers like Hasbro to create some of these items.

---

[18] National Research Group, *Fortnite: The New Social Media?* (June 4, 2019), *available at* https://assets.ctfassets.net/0o6s67aqvwnu/5z4ja8fNx2NputEG49AVWs/ff1f591ad988f9a30856bab68e3908bb/NRG_Fortnite_White_Paper.pdf.

[19] Josh Taylor, *Every Single Fortnite Collab & Crossover in Battle Royale's History*, Dexerto (Aug. 26, 2024), https://www.dexerto.com/fortnite/every-fortnite-collab-crossover-battle-royale-history-1645672/.

1      97.      Epic Games knows that young children play Fortnite.

2      98.      Epic Games organizes its advertisement and collaboration strategies around the

3  interests of young children. And in 2024, Epic Games's projected annual revenue is $5.8 billion.[20]

4  As a result of, in part, its partnership strategies, Epic Games will make a significant portion of that

5  $5.8 billion from young children and their families, while its partnerships further encourage children

6  under 13 to keep using its Products.

7      **C.      Fortnite was Designed with Intentionally Addictive Features**

8      99.      Epic Games knows that minors and those who are susceptible to addiction are using

9  its Product, but nonetheless chose to add features to its Product to intentionally addict such users.

10      100.      Epic Games designed Fortnite with numerous psychological tactics to take advantage

11  of the chemical reward system of a user's brain (especially a minor or neurodivergent person) and to

12  create addictive engagement, while knowing that abuse, addiction, and compulsive use by minors and

13  neurodivergent individuals can lead to injury, including but not limited to brain damage, dissociative

14  behavior, withdrawal symptoms, social isolation, negative consequences on cognitive processes, and

15  other harmful effects.

16      101.      Epic Games actively employs or has employed psychologists and behavioral experts

17  within its User Experiences department and Online department.[21]

18      102.      Upon information and belief, Epic Games designed Fortnite in conjunction with

19  psychologists and other behavioral experts to ensure the addiction of minor and neurodivergent users.

20      103.      For example, Epic Games designed an achievement system within Fortnite that

21  rewards users for completing various tasks or actions. For example, a user playing Fortnite can unlock

22  an achievement for saving 10,000 survivors in successful missions or completing 1,000 missions.

23

24  [20] Josh Howarth, *Fortnite User and Growth Stats 2024*, Exploding Topics (Jul. 22, 2024),
   https://explodingtopics.com/blog/fortnite-stats.

25  [21] *See, e.g.*, Ben Taels, LINKEDIN, https://www.linkedin.com/in/ben-taels-06913a15 (last visited
   Sept. 4, 2024); Celia Hodent, LINKEDIN, https://www.linkedin.com/in/celiahodent (last visited

26  Sept. 4, 2024); *Video Games, Psychology, and the User Experience with Dr. Celia Hodent (Epic
   Games)*, NC State University Libraries, https://www.lib.ncsu.edu/events/video-games-psychology-

27  and-user-experience-dr-celia-hodent-epic-
   games#:~:text=Video%20Games%2C%20Psychology%2C%20and%20the,Games)%20%7C%20N

28  C%20State%20University%20Libraries (Feb. 2, 2016); Katelyn Procci, LINKEDIN,
   https://www.linkedin.com/in/katelynprocci (last visited Sept. 4, 2024).

When the user unlocks an achievement, they can see what percentage of other users have unlocked the achievement. Many achievements are difficult to obtain and require hundreds of hours of gameplay to unlock. This system is designed to keep users engaged with the game, incentivize long periods of gaming over many days, and ultimately increase Epic Games' profits.

104.    Likewise, as noted above, Epic Games designed a Battle Pass system that allows players to earn various time-limited in-game rewards and cosmetics by obtaining points through the completion of increasing difficult challenges across repeated hours and sessions of gameplay or by spending real-world money through V-Bucks.

105.    The use of microtransactions within an otherwise free Product, a lack of warnings about the harms of use, no self-imposed limits on playtime, and other features described herein are all examples of Epic Games employing these psychological tactics.

106.    Epic Games failed to disclose that it designed the Fortnite with numerous psychological tactics to take advantage of the chemical reward system of a user's brain (especially a minor or neurodivergent person) and to create addictive engagement, while knowing that abuse, addiction, and compulsive use by foreseeable users, *i.e.*, minors and neurodivergent individuals, can lead to brain damage, abuse, compulsive use, addiction, and other injury, and, as such, the Product poses significant risk of harm.

107.    Epic Games knew that its Fortnite Product contained an inherent risk of abuse, addiction, and compulsive use by minors and the harms that arise therefrom, but instead of disclosing such harms, Epic Games marketed Fortnite as "educational" and safe for use by minors (inside and outside the classroom).

108.    Epic Games misrepresented Fortnite as educational and safe for use by minors and neurodivergent individuals, including FAS, while knowing that abuse, addiction, and compulsive use by such Product users can lead to brain damage and injury, and knowing that it had designed and developed Fortnite to be as addictive as possible.

109.    Epic Games did not inform and concealed from the public, including Plaintiff FAS, that Fortnite posed significant risks of harm to users due to Epic Games's decision to design Fortnite

1  to be as addictive as possible, while knowing that abuse, addiction, and compulsive use by minors

2  and neurodivergent individuals can lead to brain damage and injury in those individuals.

3      **D.**   **Epic Games Deceptively Promises Safety and Educational Value in Fortnite**

4      110.    Epic Games assures users that it wants its Product to be a "safe place for [users] to

5  play games."[22]

6      111.    Despite assurances of safety, the addictive properties and design features, as alleged

7  herein, of Fortnite are so dangerous to users, and especially minors, that several health and behavioral

8  centers across the country have published resources for parents specifically warning about Fortnite

9  addiction.[23] Many health experts have concluded that Fortnite is more addictive than heroin and other

10 illegal drugs.[24]

11     112.    Despite these third-party warnings of the dangers of Fortnite, Epic Games has failed

12 to disclose the risks of harm purposefully built into the Fortnite.

13     113.    Although Fortnite features some parental controls, they are grossly deficient. While

14 minor accounts automatically restrict some in-game communication, there is no age verification

15 process. If a minor who is under 13 wants to sign up with a fictitious birth date, they can, and can

16 play Fortnite without the restrictions of an account where the user represents they are under 13.

17     114.    Fortnite could, but chooses not to, require express parental consent for minors under

18 13 to create an account. If a minor under 13 creates an account, they can still access most game

19 content and purchase items.

20     115.    Fortnite imposes a daily spending limit on minors under 13, however, that limit is

21 $100 per *day*.[25] A minor under 13 could spend $36,500 on Fortnite in a year without any parental

22 consent or permission.

23 

---

24 [22] *Epic Games: Community Rules*, Epic Games, https://www.epicgames.com/site/en-US/community-rules (last visited Nov. 26, 2024).

25 [23] Rachel Ehmke, *A Parent's Guide to Dealing With Fortnite*, Child Mind Institute, https://childmind.org/article/parents-guide-dealing-fortnite/ (last visited Aug. 26, 2024).

26 [24] *Health Experts: Video Game "Fortnite" Can Be Addictive As Heroin*, KRON ABC 8 News (Sep. 29, 2018), https://www.wric.com/news/whats-trending/health-experts-video-game-fortnite-can-be-addictive-as-heroin/.

27 [25] Daily Spending Limits For Players Under 13, Epic Games, https://www.epicgames.com/help/en-US/c-Category_EpicAccount/c-EpicAccounts_ParentalControls/daily-spending-limits-for-players-under-13-a000085524 (last visited Aug. 26, 2024).

28

116.     While Fortnite imposes *some* automatic restrictions on minor's accounts if the user is under 13, the parental controls and restrictions can only be accessed via the minor's account. To engage with/change any parental control settings, the parent must first know that the account exists, and subsequently know the log in information of their minor.

117.     Epic Games does not provide parental controls regarding screen time, gameplay, and/or usage. Epic Games could, but chooses not to, allow parents to set time limits on their minor's Fortnite account. Epic Games also could, but does not, allow users to set self-imposed time limits on their Fortnite account.

118.     At account setup, Fortnite's website contains no warnings labels, banners, or messaging informing minor users or their guardian's of the known risks and harms stemming from the excessive use of Epic Games's Product. Users are not provided with information regarding potential physical and mental harm associated with gameplay.

119.     During gameplay, there are no warnings labels, banners, or messaging informing minor users or their guardians of the known risks and harms stemming from the use of Epic Games's Product. Users are not provided with information regarding potential physical and mental harm associated with gameplay.

120.     Epic Games designed and developed Fortnite games with the use of addictive operant conditioning to make users want to keep using the Product more and more.

121.     The team that developed Fortnite includes psychologists, statisticians, analysts, and coordinators who worked for nearly four years to develop a Product that was as addictive as possible.

122.     Upon information and belief, Epic Games has licensed patented addictive technologies from other video game developers and publishers to include additional addictive features in Fortnite.

123.     Epic Games does not disclose to the public or the users of Fortnite any of the psychological tactics or addictive features it purposefully incorporates into its Product. Instead, Epic Games touts Fortnite as "educational" and markets it for use in the classroom.

124.    On its website, Epic Games even offers "Free Fortnite lesson plans" to educators on subjects ranging from history, geography, and programming:[26]



125.    Epic Games joined the Family Online Safety Institute ("FOSI") in 2023, stating it wants to "support [FOSI's] work to keep kids safe online." Epic Games's Senior Director of Public Policy represents Epic Games wants to "be on the forefront of creating fun and safe games and experiences for people of all ages," emphasizing its alleged focus on the importance of safety for children playing its games, including Fortnite.[27]

126.    Engaging and addicting users who are minors early and in environments such as their classroom increases Epic Games's revenue through continued use of Fortnite by young users, at the expense of these users' mental and physical health.

127.    Epic Games does not adequately inform, or inform at all, users of the inherent risks involved with using Fortnite, specifically including that Fortnite was designed to addict users to their extreme harm and detriment.

## VII. Minecraft

### A.    **Microsoft Design, Develop, and Market Minecraft.**

128.    Minecraft was first developed and released by Mojang in November of 2011.

---

[26] *Education*, Epic Games, https://dev.epicgames.com/documentation/en-us/fortnite-creative/education-in-fortnite-creative (last visited Aug. 26, 2024).
[27] *Epic Games Joins the Family Online Safety Institute,* FOSI (Nov. 28, 2023), https://www.fosi.org/about-press/epic-games-joins-the-family-online-safety-institute.

COMPLAINT FOR DAMAGES AND DEMAND FOR JURY TRIAL

1    129.    In September 2014, Microsoft acquired Mojang and its intellectual property (including

2    Minecraft).

3    130.    After its acquisition of Mojang, Microsoft has been directly and actively involved in

4    the design, development, testing, production, manufacture, labeling, marketing, advertising,

5    promotion, supply, sale, and distribution of Minecraft. Indeed, since acquiring Mojang, Microsoft has

6    overseen over 125 updates to Minecraft.

7    131.    To date, over 300 million copies of Minecraft have been sold,[28] and the game averages

8    around 100 million players per month.[29]

9    **B.    Minecraft Gameplay Basics**

10    132.    Minecraft is a 3D sandbox game that can be played on a PC, various gaming consoles

11    including Xbox, and mobile devices.

12    133.    Minecraft's visual design is simple, using blocky, pixelated graphics, and basic colors.

13    134.    The game itself is easy for users to learn and understand. Gameplay involves the user's

14    character collecting resources, exploring the Minecraft world, crafting items, and trying to survive.

15    The Minecraft world is virtually infinite and is generated based on the user's exploration.

16    135.    There are multiple game modes, including survival mode and creative mode. Users in

17    survival mode must gather resources to build structures and maintain their health while avoiding

18    attacks from monsters known as "mobs." Users in creative mode have access to unlimited resources

19    they can use to craft items or create structures. Within the creative game mode, the user cannot get

20    hurt by attacking "mobs." Each game mode offers slightly different building abilities and access to

21    resources.

22    136.    Minecraft users are encouraged to join different "worlds," which can include

23    multiplayer or single-player worlds depending on what kind of world the user enters. To generate a

24

25    [28] Britney Nguyen, *Minecraft Just Surpassed 300 Million Sales–Here's The Only Video Game Still Beating It*, Forbes (Oct. 16, 2023),

26    https://www.forbes.com/sites/britneynguyen/2023/10/16/minecraft-just-surpassed-300-million-sales-heres-the-only-video-game-still-beating-

27    it/#:~:text=Minecraft%20has%20reached%20over%20300,Minecraft%20Live%202023%20this%20weekend..

28    [29] Spencer Whitworth, *Minecraft Live Player Count (September 2024)*, Sportskeeda (Sept. 1, 2024), https://www.sportskeeda.com/minecraft/minecraft-live-player-count.

COMPLAINT FOR DAMAGES AND DEMAND FOR JURY TRIAL

world to play in, users utilize "seeds" which are essentially computer codes. Once a player enters a seed, the code creates a world for the user to explore. The seed shapes the landscape of the world.

137.    The exact structures of most worlds are unique to that world, but worlds created with the same seed will be identical. Users can share seeds with friends so the friends can create the same world using that seed.

138.    Microsoft designed Minecraft with multiplayer options, allowing players to interact and communicate with each other in the game world.

139.    There are different versions of Minecraft available for play depending on the platform used. The original version of Minecraft, now called "Minecraft Java", is available for play on a PC. The most popular version of Minecraft, and the version available on most platforms, is called "Minecraft Bedrock". Minecraft Java and Minecraft Bedrock are similar, however the Bedrock version is still currently updated and has additional features that Minecraft Java does not have.

140.    In order to play Minecraft, users must purchase the game and create a Minecraft account.

141.    To create a Minecraft account, users must input a pre-existing Microsoft account, or create a Microsoft account, and choose a password. Users of any age can create a Minecraft account. There is no age verification upon sign-up on the Minecraft website.

142.    Minecraft has its own form of currency called "Minecoins." One Minecoin is worth less than one US dollar. Minecoins can only be purchased with real currency.

143.    Minecoins can be used to purchase various in-game features such as new skins for the user's avatar, "texture packs" that change the appearance of building blocks within the game, "mash-up packs" that allow users to enter themed worlds with special textures and skins, mini games, and access to new adventures via adventure maps.[30]

144.    In addition to the base game, users can purchase a "Marketplace Pass" for $3.99 per month. The Pass allows subscribers to "[p]lay 150+ pieces of exciting content,…dive into worlds,

---

[30] *Minecraft Marketplace*, Minecraft, https://www.minecraft.net/en-us/marketplace (last visited Sept. 25, 2024).

1    mash-ups, skins packs, texture packs, and more." New content is added every month to the Pass.[31]

2    145.    Users can also purchase a "Realms Subscription" which allows them to run their own

3    Minecraft server and share their Marketplace Pass items with up to 10 friends. A Realms Subscription

4    starts at $3.99 per month.

5    146.    In 2024, Minecraft brought Microsoft approximately $220,000,000.00 in revenue.[32]

6    **C.    Minecraft Markets to Young Children to Increase Profits**

7    147.    Minecraft is rated as safe for children 10 and older by the Entertainment Software

8    Rating Board ("ESRB"), which is the leading game-rating system for games in the United States.

9    148.    Nonetheless, Microsoft knows that much of Minecraft's player base is younger than

10    10.

11    149.    Studies have shown that approximately 53% of children aged 6 to 8 and 68% of

12    children aged 9 to 12 play Minecraft.[33]

13    150.    Despite Minecraft's age rating, Minecraft has engaged in numerous in-game virtual

14    and physical product collaborations with child-friendly entities such as LEGO, Avengers, Guardians

15    of the Galaxy, Spiderman, Moana, Star Wars, Sonic the Hedgehog, Super Smash Bros., The

16    Incredibles, Angry Birds, Frozen, Ice Age, Sponge Bob Square Pants, Toy Story, Minions, Power

17    Rangers, Fortnite, and more.[34]

18    151.    Most, if not all, of these collaborations are geared towards a wide audience that

19    unmistakably includes minors under the age of 10. Many young children watch Disney movies or

20    play with LEGOs or Hot Wheels. Microsoft explicitly and intentionally markets Minecraft to young

21    children by collaborating with the above entities.

22

23

---

24    [31] *Minecraft Marketplace Pass*, Minecraft, https://www.minecraft.net/en-
25    us/marketplace/marketplace-pass (last visited Sept. 25, 2024).
     [32] David Curry, *Minecraft Revenue and Usage Statistics (2024)*, Bus. of Apps (Jan. 10, 2024),
26    https://www.businessofapps.com/data/minecraft-statistics/.
     [33] Jane Mavoa & Marcus Carter, *Minecraft Teaches Kids About Tech, But There's A Gender
27    Imbalance At Play*, The Conversation (Jan. 16, 2018), https://theconversation.com/minecraft-
     teaches-kids-about-tech-but-theres-a-gender-imbalance-at-play-89496.
28    [34] *Category: Collaborations*, Minecraft Wiki, https://minecraft.wiki/w/Category:Collaborations
     (last visited Sept. 26, 2024).

152.     In addition to virtual collaborations, Microsoft also has physical Minecraft merchandise they produce or sponsor, most of which are toys or children's items. For example, Microsoft has created a kids' educational touchscreen smart watch; an LED lamp that looks like a Minecraft torch; a glitter motion light; plush toys based on Minecraft characters; Minecraft themed LEGO sets, action figures, board games, and Hot Wheels; foam weapons; clothing; pajamas; and Halloween costumes. Minecraft also has a line of books for children as young as five that are intended to teach children how to read.

153.     Microsoft organizes  advertisement and collaboration strategies around the interests of young children and makes a significant portion of their revenue from young children and their families.

**D.     Minecraft was Designed with Intentionally Addictive Features**

154.     Microsoft knows that minors and those who are susceptible to addiction are using their Product, but nonetheless chose to add features to Minecraft to intentionally addict such users.

155.     Upon information and belief, Microsoft actively employs or has employed psychologists and behavioral experts to work on Minecraft development.

156.     Microsoft designed Minecraft with psychological tactics to take advantage of the chemical reward system of a user's brain (especially a minor or neurodivergent person) and to create addictive engagement, while knowing that abuse, addiction, and compulsive use by minors and neurodivergent individuals can lead to injury, including but not limited to brain damage, dissociative behavior, withdrawal symptoms, social isolation, negative consequences on cognitive processes, and other harmful effects.

157.     For example, Microsoft created specific in-game reward system known as "advancements" or "achievements" in order to incentivize players to engage in repeated and prolonged sessions playing Minecraft.

COMPLAINT FOR DAMAGES AND DEMAND FOR JURY TRIAL

158.     In Minecraft Java, when a user completes a specific action or "advancement," they receive a number of "Experience Orbs" or "EXP" or "XP", which are used like a currency to enhance user's in-game equipment and reach new levels of the game. XP is gained by performing specific tasks, like successfully defending a village from a raid or killing a hostile monster:[35]



| Hero of the Village | Successfully defend a village from a raid | Voluntary Exile | Kill at least one raid mob during a raid and wait until it ends in victory. *This is a hidden advancement, meaning that it can be viewed by the player only after completing it, regardless of if its child advancement(s), if any, have been completed.* | adventure/hero_of_the_village | ● 100 experience |

159.     When a user obtains enough XP, they can "level up", meaning the user's character advances to a higher level, becomes more powerful, and gains access to new talents and equipment.[36]

160.     In Minecraft Bedrock, when a user completes a specific action or task, they receive an achievement or trophy. The achievement is then logged in the player's Minecraft account. Most achievements provide in-game rewards such as creator items or emotes when unlocked.

161.     Not all advancements and achievements are equally easy to obtain. Instead, Microsoft has intentionally created advancements and achievements that incentivize many hours and/or days of gameplay. By way of example, Microsoft chose to reward players for playing Minecraft for 100 days, playing underwater for 10 minutes, building maps from pieces hidden throughout the game, trading 1,000 emeralds, collecting a surplus of resources, and more. These achievements can take countless hours across many days to unlock due to the complexity and/or time-consuming nature of the steps needed to unlock the achievement.

162.     This reward system creates addictive engagement and encourages players to continue gameplay.

163.     The use of reward systems, a lack of warnings about the harms of use, no option for self-imposed limits on playtime, and other features described herein are all examples of Microsoft

---

[35] *Advancement*, Minecraft Wiki, https://minecraft.fandom.com/wiki/Advancement (last visited Mar. 24, 2025).

[36] *How to Earn Experience Points & Level Up in Minecraft*, (Jan. 24, 2022), https://www.dummies.com/article/home-auto-hobbies/games/online-games/minecraft/how-to-earn-experience-points-and-level-up-210066/.

COMPLAINT FOR DAMAGES AND DEMAND FOR JURY TRIAL

designing Minecraft with harmful psychological tactics to take advantage of the chemical reward system of a user's brain (especially a minor or neurodivergent person) to create addictive engagement, despite Microsoft 's knowledge that abuse, addiction, and compulsive use of its Product by foreseeable users, *i.e.*, minors and neurodivergent individuals, can lead to brain damage, abuse, compulsive use, addiction, and other injury.

164.    Microsoft knew that its Minecraft Product contained an inherent risk of abuse, addiction, and compulsive use by minors and the harms that arise therefrom, but instead of disclosing such harms Microsoft marketed Minecraft as "educational" and safe for use by minors (inside and outside the classroom).

165.    Microsoft misrepresented Minecraft as educational and safe for use by minors and neurodivergent individuals, including FAS , while knowing that abuse, addiction, and compulsive use by such Product users can lead to brain damage and injury, and knowing that it had designed and developed Minecraft to be as addictive as possible.

166.    Microsoft did not inform and concealed from the public, including Plaintiff FAS and their guardian, that Minecraft poses significant risks of harm to users due to Microsoft decisions to design Minecraft to be as addictive as possible, while knowing that abuse, addiction, and compulsive use by minors and neurodivergent individuals can lead to brain damage and injury in those individuals.

**E.    Microsoft Deceptively Promises Safety and Educational Value in Minecraft**

167.    Microsoft does not adequately inform users of the inherent risks involved with using and playing Minecraft or that the Product was designed to make users play more to their potential harm.

168.    Instead, Minecraft's website provides users, potential users, and guardians with false assurances of safety. For example, Microsoft states that:

> a.    they "hold [them]selves accountable for making Minecraft as safe as possible for everyone."[37]

---

[37] *Minecraft Help Center – General Safety*, Minecraft, https://help.minecraft.net/hc/en-us/articles/8047895358605 (last visited Sept. 26, 2024).

      b.  it is "so important that [their] games are a safe and welcoming place for all players."[38]

      c.  "player safety is a priority …\to ensure everyone feels safe."[39]

      d.  their "community standards help [them] build a community that is open and safe for everyone."[40]

169.    Minecraft does feature some parental controls, but they are grossly deficient. While minor accounts for children younger than 16 are automatically created with some restrictions on in-game communications and other features, there is no age verification process. If a minor who is under 16 wants to create a Minecraft account with a fictitious birth date, they can, and can then create an account and play Minecraft without the restrictions of an account where a user represents they are under 16.

170.    Microsoft could, but chooses not to, require express parental consent for minors under 16 to create an account. If a minor under 16 creates an account, they can still access almost all game content and purchase items. There is no daily spending limit automatically imposed on any minor accounts.

171.    Guardians can access parental controls to change the automatic restrictions set by Microsoft if their minor is under 16, however, such features are only available if a parent creates their own account and links it to the minor's account. To engage with/change any parental control settings, the parent must first know the account exists and subsequently know the gamertag information to link their account to their minor's account.

172.    Microsoft does not provide parental controls within Minecraft regarding screen time, gameplay, and/or usage. Microsoft could, but chooses not to, allow parents to set time limits on their minor's Minecraft account. Microsoft also could, but does not, allow any users to set self-imposed time limits on their Minecraft account.

---

[38] *Id.*
[39] *Community Standards for Minecraft*, Minecraft, https://www.minecraft.net/en-us/community-standards (last visited Sept. 26, 2024).
[40] *Minecraft End(er)-User License Agreement ("EULA")*, Minecraft, https://www.minecraft.net/en-us/eula (last visited Sept. 26, 2024).

173.    At account setup, Minecraft's website contains no warnings labels, banners, or messaging informing minor users of the known risks and harms stemming from excessive use of Microsoft Product. Users are not provided with information regarding potential physical and mental harm associated with gameplay.

174.    During gameplay, there are no warnings labels, banners, or messaging informing minor users or their guardians of the known risks and harms stemming from the use of Microsoft's product. Users are not provided with information regarding potential physical and mental harm associated with gameplay.

175.    Microsoft designed and developed Minecraft with the use of addictive operant conditioning to make users want to keep using the Product more and more.

176.    Upon information and belief, Microsoft designed Minecraft in conjunction with psychologists, neuroscientists, and other behavioral experts to ensure the addiction of minor and neurodivergent users.

177.    Upon information and belief, Microsoft have licensed patented addictive technologies from other video game developers and publishers to include additional addictive features in the Minecraft Product.

178.    Microsoft does not disclose to the public or users of Minecraft any of the psychological tactics or addictive features they purposefully incorporate into their Product. Instead, Microsoft touts their Minecraft game as educational and have developed Minecraft: Education Edition for use in the classroom.

179.    Minecraft: Education Edition ("Minecraft Education") is a game-based learning platform. Minecraft Education uses the Minecraft graphics with "features built specifically for learning environments." It includes over "600 standards-aligned lessons,"[41] and includes coursework across various subjects:[42]

---

[41] *What is Minecraft Education?*, Minecraft Education, https://education.minecraft.net/en-us/discover/what-is-minecraft (last visited Oct. 1, 2024).
[42] *Minecraft Education For Educators: Get Started*, Minecraft Education, https://education.minecraft.net/en-us/get-started/educators (last visited Sept. 26, 2024).

180.    Though Minecraft's age-rating is for children 10 and older, Minecraft Education has lesson plans for children as young as 5[43], and encourages school leaders, educators, and parents to use Minecraft. Minecraft Education provides resources so educators can "learn to teach with Minecraft."[44]



181.    The use of Minecraft Education introduces children to the game that are years younger than Minecraft's age rating.

182.    Microsoft does not adequately inform, or inform at all, users of the inherent risks involved with using Minecraft, specifically including that Minecraft was designed to addict users to their extreme harm and detriment.

## VIII. Microsoft's Xbox and Xbox Products

### A.    Xbox Product Basics

183.    Xbox is a video gaming brand, owned and operated by Microsoft, that consists of Xbox gaming consoles, as well as online video gaming through the Xbox network, Xbox Game Pass, and Xbox Cloud Gaming.

184.    Each version of the Xbox console provides users with the ability to play video games using a hard copy of the video game, a digital copy downloaded from the Microsoft Store (also known as Xbox Games Store, hereinafter "Xbox Store"), using the Xbox Network (formerly known as Xbox Live), and/or using Xbox Game Pass or Cloud Gaming.

---

[43] Minecraft's own website states "[s]oon students from kindergarten to graduation can utilize Minecraft Education." *Back to School Preview: Make it Minecraft!*, Minecraft Education (Jun. 23, 2023), https://education.minecraft.net/en-us/blog/back-school-preview-make-it-minecraft.
[44] *Minecraft Education For Educators: Get Started*, Minecraft Education, https://education.minecraft.net/en-us/get-started/educators (last visited Sept. 26, 2024).

185.    Microsoft developed and maintains the Xbox Store – a product-platform through which users can purchase thousands of games to be stored on their console through digital download, and for use with its Xbox consoles.

186.    Though third parties create the games available in the Xbox Store, Microsoft profits from all monetary transactions that occur within the store, taking thirty percent of revenue from sales of third-party console games.[45]

187.    Likewise, Microsoft profits from all monetary transactions that occur within the third-party games played on its Xbox Platform.

188.    Microsoft markets the Xbox Store as "safer for the whole family" to use:



189.    Microsoft also touts that "Xbox strives to create a safer gaming experience for you and your family."[46]

190.    The Xbox Network is an online multiplayer gaming service created and operated by Microsoft for use with its Xbox consoles. The Xbox Network includes the Xbox Store and Xbox Cloud Gaming.

191.    Xbox Cloud Gaming or Game Pass is operated by linking a device, either a console, tablet, phone, or computer, to a remote server in the cloud. Gameplay is saved in the cloud and can

---

[45] Tom Warren, *Microsoft Explored Reducing its Xbox Store Cut to Shake Up Console Gaming*, The Verge (Mar. 2, 2021), https://www.theverge.com/2021/5/2/22415712/microsoft-xbox-store-cut-epic-games-court-documents.
[46] *Family-Friendly Gaming for Everyone*, Xbox, https://www.xbox.com/en-US/family-hub#:~:text=FAMILY%2DFRIENDLY%20GAMING%20FOR%20EVERYONE&text=Xbox%20strives%20to%20create%20a,Windows%2C%20and%20Xbox%20mobile%20apps (last visited Mar. 27, 2025).

be accessed and used from numerous devices at any given location. Thousands of games are available in the Xbox Cloud Gaming and Xbox Network library, including Fortnite, and Minecraft.

**B.**     **Microsoft Employs a Game-Like Achievement System On Its Platforms that Causes and/or Exacerbates Compulsive Game Use.**

192.    Microsoft knows that third-party games targeted to minors – such as  Fortnite, and Minecraft – are available on its Xbox Platform. Microsoft is therefore aware that minors and those who are susceptible to addiction are using its Xbox Platform. Nonetheless, Microsoft chose to add features to its Xbox Platform that intentionally addict such users.

193.    Microsoft actively employs or has employed psychologists and neuroscientists within its Xbox User Research and Xbox Player Experiences & Platform departments.[47]

194.    Upon information and belief, through the use of such psychologists and neuroscientists, Microsoft developed its Xbox achievement system to keep users compulsively and addictively engaged with its platform, despite its knowledge that abuse, addiction, and compulsive use by minors can lead to brain damage and injury, including but not limited to dissociative behavior, withdrawal symptoms, social isolation, negative consequences on cognitive processes, and other harmful effects.

195.    For example, within its Xbox Products, Microsoft developed and implemented a program called the Xbox achievement system ("Xbox achievements" or "achievements"). Xbox achievements is a game-like program that tracks the amount of time a player spends in third-party games on the Xbox platform and the player's actions within those games.

196.    Microsoft encourages game developers to use its achievement system by creating tasks for players to accomplish within their respective games.

---

[47] *See* Deborah Hendersen, LINKEDIN, https://www.linkedin.com/in/deborahjohendersen (last visited Oct. 3, 2024); Todd Kelley, LINKEDIN, https://www.linkedin.com/in/toddakelley (last visited Oct. 3, 2024); Carolina Labbé, LINKEDIN, https://cl.linkedin.com/in/carolinalabbe (last visited Oct. 3, 2024); Emily Joseph, LINKEDIN, https://www.linkedin.com/in/emilymjoseph1?trk=public_post_feed-actor-name (last visited Oct. 3, 2024).

197.    Microsoft makes available to all users the achievements that are available within the games they are playing.

198.    Many of the achievements created within Microsoft's achievement system are met by players spending excessive time in-game. For example, a player can earn the Minecraft "Passing the Time" achievement by playing Minecraft on Xbox for 100 days.  a. Similarly, Fortnite includes the "Talented Builder" achievement for building 500,000 structures within the game.

199.    Within each user's Xbox profile, an "achievements" tab displays each game where the user has obtained an achievement. Within the achievements tab, each game shows the percentage of other players who have unlocked the same achievement, and the date it was unlocked:

 

200.    If a user has their Xbox Platform on, but fails to engage with it for a length of time, Microsoft displays a screensaver that highlights a user's progress in unlocking achievements within a third-party's game.

201.    When these achievements are earned, *Microsoft* – not the third-party games – notifies the player with a console based – not game based – message. This console based message is akin to the lights and sounds of a slot machine in a casino. Microsoft plays a reward-signifying noise and displays a bright message on the screen highlighting the player's accomplishment:

- 39 -



202.    Xbox achievements are categorized as either standard achievements or rare achievements. When a rare achievement is unlocked, the graphic displayed on the user's screen in-game indicates that the achievement is rare. A rare achievement is one that less than 10% of users have unlocked.

203.    In addition to such messages, Microsoft awards players a "Gamerscore" for each achievement earned. In game-like fashion, Microsoft tabulates each player's Gamerscore for the achievements earned across all games played on the Xbox platform and displays that score for all other users to see.

204.    While Xbox achievements earned and a player's Gamerscore can be an indication to other users and friends about how much and how well a user has played, Microsoft's purpose for implementing Xbox achievements goes beyond the social aspects of gaming. Rather, Microsoft created the Xbox achievement system in order to incentivize extended and continued gameplay on its platform, resulting in more purchases in-game or of third-party games, all of which increase Microsoft's profits.

205.    Microsoft's Platform does not contain any warnings about the general harmful nature of its achievement system or general gaming addiction. At account setup, the Xbox website contains no warnings labels, banners, or messaging informing minor users of the known risks and harms stemming from the use of the Xbox platform. Users are not provided with information regarding potential physical and mental harm associated with use of the platform, including stress, aggressive behavior, verbal memory deficiency, depression, lowered cognitive abilities, sleeping disorders, anxiety, and behavioral addiction disorders at account setup or at any time during usage. Users are

1 | not provided with information regarding potential physical and mental harm associated with use of

2 | its platform.

3 |     206.    Microsoft could, but chooses not to, provide warnings about the harms of use of its

4 | platform without any changes to the achievement system or the content of the achievements.

5 |     207.    Microsoft could, but chooses not to, implement user protections or safeguards, such

6 | as user-imposed time limits on gameplay, increased age verification at account setup, and automatic

7 | parental controls imposed when a minor creates an Xbox account.

8 |     **C.**    **Microsoft's Xbox Products Do Not Include Adequate Parental Controls**

9 |     208.    To make an Xbox profile, users must first create a Microsoft account, or link to a pre-

10 | existing Microsoft account.

11 |     209.    If a user already has a Microsoft account, no age verification is required to create an

12 | Xbox profile.

13 |     210.    Most parental controls are not automatically applied to a minor's Xbox profile upon

14 | creation. A parent or guardian can only implement parental controls by accessing the console itself

15 | and adjusting settings to apply controls, by logging into the Xbox profile wherein they want to impose

16 | parental controls, or by connecting their child's account to their own Microsoft profile. To engage

17 | with/change any parental control settings, the parent must first know the account exists, and

18 | subsequently know the child's gamertag information to implement controls on their minor's account.

19 |     211.    Microsoft could, but chooses not to, automatically implement all parental controls on

20 | minors' Xbox profiles upon creation.

21 |     **PLAINTIFF-SPECIFIC ALLEGATIONS**

22 |     212.    FAS's gaming addiction is a substantial factor in the decline of FAS's academic

23 | performance.

24 |     213.    FAS 's gaming addiction is a substantial factor in the necessity of FAS's care that

25 | includes diagnostic testing, counseling, treatment and mental health monitoring.

26 |     214.    Plaintiff FAS's usage of Defendants' Products is compulsive and disordered, and he

27 | is incapable of restraining his own usage. Any attempt to remove FAS from his games is met with

28 | severe withdrawal symptoms including anger, injurious behavior to himself, threats of self-harm, and

refusal to maintain hygiene or sleep.  Plaintiff has been diagnosed with anxiety, depression, and has been found to suffer from symptoms of internet gaming disorder, requiring medical and psychological intervention and treatment.

215.    Plaintiff FAS has been injured and harmed as a direct and proximate result of each Defendant's actions and misconduct, and for that he is entitled to compensation and other damages under California law.

216.    Each Defendant has engaged in deceptive, unfair, immoral, and reckless behavior that damaged and continues to harm Plaintiff FAS and countless other Californians and American minors. For this, they should be punished, and punitive damages should be assessed against each Defendant for their respective misdeeds and unlawful conduct.

217.    FAS never agreed to be harmed or exposed to an addictive Product. Plaintiff never entered into a contract with any of the Defendants, and/or to the extent that any Defendant claims FAS attempted to accept an electronic terms and conditions clause by clicking buttons on a screen which included language Plaintiff did not understand, read, or which was conscionable, it has been made void by virtue of its unconscionability and the power of disaffirmance. This unconscionability and disaffirmance is demonstrated and secured by the filing of this Complaint.

218.    Specifically, to the extent that any Defendant claims Plaintiff FAS entered into a contract, any terms to which Plaintiff agreed are void and unenforceable. Each Defendant's terms of services or terms and conditions clauses is a contract of adhesion and has no variation or negotiable terms prior to the signing of parties. Further, Plaintiff, as a minor, lacked the capacity to contract, and thus expressly disaffirms any contract they may have made with any of the Defendants, or that Defendants may claim they made with them before reaching the age of majority.

219.    Plaintiff FAS's continued use of Defendants' Products, to the extent such use exists, is compulsive and due to FAS's addiction to using the Products. Plaintiff's continued use does not serve as an affirmation of any potential contract between the Parties.

///

///

///

COMPLAINT FOR DAMAGES AND DEMAND FOR JURY TRIAL

**PLAINTIFF'S CLAIMS**

**COUNT I – STRICT PRODUCT LIABILITY – DESIGN DEFECT**

**(Against Defendants, Epic Games, Microsoft in its capacity as a manufacturer of Minecraft, and DOES 1-50)**

220.    Plaintiff FAS realleges and incorporates by reference each of the preceding paragraphs above as though set forth fully here.

221.    At all relevant times, each Defendant was engaged in the business of designing, developing, managing, operating, testing, producing, manufacturing, labeling, marketing, advertising, promoting, controlling, supplying, leasing, selling, and/or otherwise distributing their respective video game Products used by FAS, each of which are defective and unreasonably dangerous.

222.    The video game Products that each Defendant placed into the stream of commerce were defectively designed. The Products were designed to cause addictive and compulsive use, including by minors. The Products are not reasonably fit, suitable, or safe for their intended purpose.

223.    The defective conditions of , Fortnite, and Minecraft rendered them unreasonably dangerous and/or not reasonably safe. The foreseeable risks outweigh the benefits associated with Defendants' designs.

224.    The defects in each Defendant's respective designs were present in the Products when the Products left the hands of Defendants and when they were released to the general public to be used in an intended and foreseeable manner.

225.    , Fortnite, and Minecraft, as designed, were unreasonably dangerous, posed a substantial likelihood of harm, and were therefore defective because of the reasons enumerated in this Complaint, including, but not limited to, each Product's design including addictive operant conditioning, each Product's design lacking warnings about the risk of addiction, each Product's design lacking safeguards such as user-imposed time restrictions on gameplay, each Product's design lacking proper minor age verification, and each Product failing to operate as a reasonable user would expect.

226. Each Defendant designed its Products to be addictive and take advantage of the chemical reward system of users' brains to establish compulsive use and addiction.

227. Each Defendant's respective Products were expected to and did reach Plaintiff FAS without substantial change in the condition in which they were designed, manufactured, labeled, marketed, promoted, supplied, and otherwise released into the stream of commerce.

228. FAS used Defendants' Products,  Fortnite, and Minecraft, in an intended and reasonably foreseeable manner, and the Products were not materially altered prior to their use.

229. Each Defendant's respective defective Products were the direct and proximate cause of FAS's injuries and harm that include, but are not limited to, emotional distress, diminished social interactions, lack of interest in other hobbies, withdrawal symptoms such as rage, anger, and physical outbursts.

230. FAS used Defendants' Products in their intended and reasonably foreseeable manner.

231. Each Defendant knew or, by the exercise of reasonable care, should have known that minors, including FAS, would use the Products without anyone inspecting the Products for addictive or other dangerous features.

232. Reasonable users of Defendants' Products would not expect, and Plaintiff FAS herein did not expect, that said Products would pose risks of severe physical and mental harm.

233. Reasonable users of Defendants' Products would not expect that Defendants knew about risks of severe physical and mental harm and nevertheless chose to place their Products into the stream of commerce.

234. Each Defendant could have utilized cost effective, reasonably feasible alternative designs to minimize these harms, such as by designing their respective Products without the harm-causing features listed above, while still providing an optimal gaming experience.

235. At the time each Defendant's Products were designed, developed, distributed to FAS, and played, safer alternative designs existed that were entirely feasible.

236. Each Defendant could have utilized cost effective, reasonably feasible alternative designs to minimize harm caused by their respective Products by implementing elements that include, but are not limited to:

     a.   Robust age verification;

     b.   Effective parental controls;

     c.   The removal of barriers to the enactment of parental controls;

     d.   Warnings of health effects of use and extended use upon sign-up;

     e.   Opt-in restrictions to the length and frequency of sessions;

     f.   Self-limiting tools, including but not limited to session time notifications, warnings, or reports.

     g.   Tools to restrict and/or block usage during certain times of day (such as during school hours or late at night);

     h.   Limits for microtransactions; and

     i.   Others as set forth herein.

237.    Instead, each Defendant designed their respective Products to aggressively addict users with features that increase use time, frequency of use, and profit to each Defendant, all to the detriment of users' wellbeing.

238.    Plaintiff FAS's injuries—physical, emotional, and economic—were reasonably foreseeable to Defendants at the time of the Products' design, marketing, and operation.

239.    Plaintiff FAS was injured as a direct and proximate result of each Defendant's placement of their respective Products into the stream of commerce, Plaintiff's use of the games as intended and designed, and the Products' defective design described herein.

240.    As a direct and proximate result of each Defendant's defective products, Plaintiff FAS suffered significant injury, harm, damages, and economic loss, and will continue to suffer such harm, damages, and economic loss in the future. FAS's injuries are permanent and will require more medical care and treatment in the future.

241.    Each Defendant's actions and omissions as alleged in this Complaint were intentional, oppressive, malicious, reckless, wanton, fraudulent, beyond all standards of decency, and without regard for human life or Plaintiff FAS's rights, thereby warranting the imposition of punitive damages. Thus, Plaintiff seeks actual and punitive damages according to proof.

///

## COUNT II – STRICT PRODUCT LIABILITY – FAILURE TO WARN

## (Against Defendants , Epic Games, Microsoft in its capacity as a manufacturer of Minecraft, and DOES 1-50)

242.     Plaintiff FAS realleges and incorporates by reference all the foregoing allegations of every paragraph of this Complaint as if repeated in full here.

243.     At all relevant times, each Defendant was engaged in the business of designing, developing, managing, operating, testing, producing, manufacturing, labeling, marketing, advertising, promoting, controlling, supplying, leasing, selling, and/or otherwise distributing their respective video game Products used by FAS, each of which are defective and unreasonably dangerous.

244.     Defendants knew, or should have known, that ordinary consumers such as Plaintiff FAS would not have realized the potential risks of the Products. , Fortnite, and Minecraft are highly addictive and likely to cause mental and physical injuries as listed above.

245.     Defendants knew, or should have known, that the use of , Fortnite, and Minecraft was dangerous, harmful, and injurious when used by Plaintiff FAS in a reasonably foreseeable manner.

246.     Defendants knew that their Products are and were harmful, capable of causing and in fact were designed to cause compulsive, addictive use, particularly in minors, and that such use could result in severe physical, mental, and emotional injuries.

247.     Defendants owed a duty to warn consumers of the foreseeable risks and dangers of the Products that the Defendants knew were present but not obvious or known to users, especially underage users, or their caregivers, or any average member of the consuming public.

248.     Upon information and belief, Defendants failed to include any warning or instructions regarding the herein identified risks and dangers of using Defendants' Products, including risks posed to minors who use the Products, in their intended and foreseeable manner.

249.     None of Defendant's respective Products, as identified herein, contain a warning, nor have they ever contained a warning, that their Products pose an unreasonable risk of harm and addiction to users, particularly minors.

250.     Defendants' Products did not contain a warning when the Products left their

1    possession.

2         251.    Each Defendant failed to provide timely and adequate warnings, instructions, and

3    information by, including but not limited to:

4              a.  failing to ensure the Products included warnings regarding their

5                  addictive design that were accurate, conspicuous, and adequate, despite

6                  having extensive knowledge of the risks associated with their use;

7              b.  failing to conduct adequate pre-and-post-market safety testing such that

8                  an adequate warning could have been issued to users;

9              c.  failing to include adequate and conspicuous warnings that would alert

10                 users to the dangerous risks of the Products, including but not limited to

11                 the risks of causing severe and life-altering physical, mental, and

12                 emotional disorders and behaviors in minors, especially those with

13                 neurodivergent qualities;

14             d.  failed to issue warnings to consumers regarding the dangerous risks of

15                 the Products even after the sale and/or download of their Products; and

16             e.  representing that the Product was and is safe for use, when in fact,

17                 Defendant knew or should have known that its Product was designed to

18                 cause minors to engage in excessive use until they developed an

19                 addiction or disordered compulsion to use the Product.

20         252.    Moreover, each Defendant breached its respective duty of care owed to Plaintiff FAS

21    through their non-feasance, failure to act, and omissions in the development, setup, management,

22    maintenance, operation, marketing, advertising, promotion, supervision, and control of their

23    respective Products. Those breaches include but are not limited to:

24             a.  Designing the Products to be more addictive and to target specific individuals

25                 based on information obtained and retained by Defendants and/or third-parties;

26             b.  failing to implement effective parental controls;

27             c.  failing to implement reasonably available means for users or their parents to

28                 monitor for and limit or deter their own excessive frequency or duration of use of

Products, including patterns, frequency, or duration of use that are indicative of addiction, compulsive use, or overuse;

d.  failing to implement reasonably available means to monitor for and limit or deter excessive overspending by minors on in-game downloadable Products and upgrades and in-game purchases and/or microtransactions; and

e.  failing to implement reasonably available means to allow users or their parents to limit or deter use of Products by minors during ordinary times for school or sleep.

253.    The failure of each Defendant to adequately warn about their defective Products created a danger of injuries described herein that were reasonably foreseeable at the time of the design, development, and dissemination of the Products.

254.    A reasonable company under the same or similar circumstances would have warned and instructed Plaintiff FAS of the dangers.

255.    Had Plaintiff been aware that the Products could cause significant harm such as aggressive behavior, verbal memory deficiency, depression, lowered cognitive abilities, sleeping disorders, anxiety, and behavioral addiction disorders, Jennifer Sawyer would not have purchased or allowed FAS to use or continue to use Defendant's respective Product. Likewise, FAS would not have used or continued to use Defendants' Products. Alternatively, if Defendants had adequately warned or instructed FAS's guardian and/or FAS they would have taken precautions when using Defendant's respective Product to eliminate or mitigate the risk of harm.

256.    As a direct and proximate result of each Defendant's defective products and failure to warn about said Products, Plaintiff FAS suffered significant injury, harm, damages, and economic loss, and will continue to suffer such harm, damages, and economic loss in the future. FAS's injuries are permanent and will require more medical care and treatment in the future.

257.    Each Defendant's actions and omissions as alleged in this Complaint were intentional, oppressive, malicious, reckless, wanton, fraudulent, beyond all standards of decency, and without regard for human life or Plaintiff FAS's rights, thereby warranting the imposition of punitive damages. Thus, Plaintiff seeks actual and punitive damages according to proof.

COMPLAINT FOR DAMAGES AND DEMAND FOR JURY TRIAL

## COUNT III – NEGLIGENCE – DESIGN

**(Against Defendants Epic Games,  Microsoft in its capacity as a manufacturer of Minecraft, and DOES 1-50)**

258.     Plaintiff FAS realleges and incorporates by reference all the foregoing allegations of every paragraph of this Complaint as if repeated in full here.

259.     At all relevant times, each Defendant was engaged in the business of designing, developing, managing, operating, testing, producing, manufacturing, labeling, marketing, advertising, promoting, controlling, supplying, leasing, selling, and/or otherwise distributing their respective video game Products used by FAS, each of which are defective and unreasonably dangerous.

260.     Defendants knew, or should have known, that the use of , Fortnite, and Minecraft was dangerous, harmful, and injurious when used by Plaintiff FAS in a reasonably foreseeable manner.

261.     Defendants knew, or should have known, that ordinary consumers such as Plaintiff FAS would not have realized the potential risks and dangers of Roblox, Fortnite, and Minecraft. By design, Roblox, Fortnite, and Minecraft are highly addictive and likely to cause mental and physical injuries as listed above.

262.     Each Defendant owed a duty to all reasonably foreseeable users to design a safe Product.

263.     , Fortnite, and Minecraft as designed were unreasonably dangerous, posed a substantial likelihood of harm, and were therefore defective because of reasons enumerated in this Complaint, including, but not limited to, the use of operant conditioning in game design, the use of microtransactions in game design, the creation of Products that do not contain warnings about the potential harm of use, the creation of Products without safeguards such as time restrictions on gameplay, the creation of Products without proper minor age verification, and because the Products created failed to operate as a reasonable user would expect.

264.     Defendants breached their duty by failing to use reasonable care in the design of their Products by negligently designing, Fortnite, and Minecraft to specifically appeal to and to take advantage of minors, who were particularly unable to appreciate the risks of the Products.

265.    Defendants breached their duty by failing to use cost effective, reasonably feasible alternative designs that would make their Products less addictive and harmful to minors, including but not limited to:

        a.   Robust age verification;

        b.   Effective parental controls;

        c.   The removal of barriers to the enactment of parental controls;

        d.   Warnings of health effects of use and extended use upon sign-up;

        e.   Opt-in restrictions to the length and frequency of sessions;

        f.   Self-limiting tools, including but not limited to session time notifications, warnings, or reports.

        g.   Tools to restrict and/or block usage during certain times of day (such as during school hours or late at night);

        h.   Limits for microtransactions; and

        i.   Others as set forth herein.

266.    Each Defendant breached their duty by failing to use cost effective, reasonably feasible alternative designs that could have reduced mental and physical harm to users, especially youth. Instead, Defendants designed Products that aggressively addict users with features that increased addictiveness, use time, frequency of use, and engagement with the Products.

267.    A reasonable company under the same or similar circumstances would have designed a safer product.

268.    As a direct and proximate result of each Defendant's negligence, Plaintiff FAS suffered significant injury, harm, damages, and economic loss, and will continue to suffer such harm, damages, and economic loss in the future. FAS's injuries are permanent and will require more medical care and treatment in the future.

269.    Each Defendant's actions and omissions as alleged in this Complaint were intentional, oppressive, malicious, reckless, wanton, fraudulent, beyond all standards of decency, and without regard for human life or Plaintiff FAS rights, thereby warranting the imposition of punitive damages. Thus, Plaintiff seeks actual and punitive damages according to proof.

## COUNT IV – NEGLIGENCE – FAILURE TO WARN

**(Against Defendants , Epic Games, Microsoft in its capacity as a manufacturer of Minecraft, and DOES 1-50)**

270. Plaintiff FAS realleges and incorporates by reference all the foregoing allegations of every paragraph of this Complaint as if repeated in full here.

271. At all relevant times, each Defendant was engaged in the business of designing, developing, managing, operating, testing, producing, manufacturing, labeling, marketing, advertising, promoting, controlling, supplying, leasing, selling, and/or otherwise distributing their respective video game Products used by FAS, each of which are defective and unreasonably dangerous.

272. Defendants knew, or should have known, that the use of their Products was dangerous, harmful, and injurious when used by Plaintiff FAS in a reasonably foreseeable manner.

273. Each Defendant knew or, by the exercise of reasonable care, should have known that its respective Products posed risks of harm to youth. These risks were known and knowable considering each Defendants' own internal information and knowledge regarding its Products at the time of the Products' development, design, marketing, promotion, advertising, and distribution to FAS.

274. Defendants knew, or should have known, that ordinary consumers such as Plaintiff FAS would not have realized the potential risks and dangers of Defendants' Products. Fortnite, and Minecraft are highly addictive and likely to cause mental and physical injuries as listed above.

275. None of Defendants' Products, as identified herein, contain a warning, nor have they ever contained a warning, that their Products pose an unreasonable risk of harm and addiction to users, particularly minors. Defendants' Products did not contain a warning of these risks when the Products left their possession.

276. Had Plaintiff been aware that the Products could cause significant harm such as aggressive behavior, verbal memory deficiency, depression, lowered cognitive abilities, sleeping disorders, anxiety, and behavioral addiction disorders, Jennifer Sawyer would not have purchased or allowed FAS to use or continue to use Defendant's respective Product. Likewise, FAS would not

have used or continued to use Defendants' Products. Alternatively, if Defendants had adequately warned or instructed FAS's guardian and/or FAS they would have taken precautions when using Defendant's respective Product in order to eliminate or mitigate the risk of harm.

277.    Each Defendant had a duty to give reasonable and adequate warning of dangers inherent or reasonably foreseeable in the use of its Product in a manner which the manufacturer should reasonably foresee.

278.    Defendants breached their duties owed to foreseeable users. That breach includes a failure to warn users that Defendants' respective Products cause addiction, compulsive use, and/or other physical and mental injuries.

279.    A reasonable company under the same or similar circumstances would have used reasonable care to provide adequate warnings to consumers, and parents of minor consumers.

280.    As a direct and proximate result of each Defendant's breach of duty to provide adequate warnings, Plaintiff FAS was harmed and sustained the injuries set forth herein.

281.    As a direct and proximate result of each Defendant's negligence, Plaintiff FAS suffered significant injury, harm, damages, and economic loss, and will continue to suffer such harm, damages, and economic loss in the future. FAS's  injuries are permanent and will require more medical care and treatment in the future.

282.    Each Defendant's actions and omissions as alleged in this Complaint were intentional, oppressive, malicious, reckless, wanton, fraudulent, beyond all standards of decency, and without regard for human life or Plaintiff FAS's rights, thereby warranting the imposition of punitive damages. Thus, Plaintiff seeks actual and punitive damages according to proof.

## COUNT V – NEGLIGENCE – ORDINARY

**(Against Defendants Epic Games, Microsoft in its capacity as a manufacturer of Minecraft, and DOES 1-50)**

283.    Plaintiff FAS realleges and incorporates by reference all the foregoing allegations of every paragraph of this Complaint as if repeated in full here.

284.    Defendants had a duty to exercise reasonable care and caution for the safety of individuals using their Products, including FAS.

285.     Defendants, in their role as product designers, developers, manufacturers, marketers, and sellers, and otherwise engaging in activity culminating in placing their Products into the stream of commerce, owed a duty to exercise ordinary care in designing and placing the Products into the stream of commerce.

286.     Defendants also owed a duty to warn users of the hazards of using their Products, which Defendants knew were present in their Products, though such hazards were not obvious to users and particularly not so to minor users.

287.     Defendants' duties also include a duty to exercise ordinary care and act as a reasonably careful company would under the circumstances.

288.     Each Defendant created harmful and addictive Products and failed to engage in the development of safer alternative designs.

289.     For their own profit, each Defendant chose not to engage in the development of a safer alternative designs.

290.     Each Defendant was negligent, reckless, and/or careless in failing to exercise ordinary care.

291.     Defendants' failure to act in developing a safer alternative designs constitutes a breach of their duty of reasonable care.

292.     Defendants knew, or should have known, that their Products are harmful, capable of causing extensive physical, mental, emotional, and financial or economic harm and damage, and that minor users are developing disordered and addicted use.

293.     Defendants were and are negligent in failing to provide adequate warnings about the dangers associated with using their Products and in failing to warn users, and the parents of users who are minors, including FAS, about how and when, if ever, to safely use their Products.

294.     Defendants were and are negligent in failing to provide users, and their caregivers in the case of users who are minors, including FAS, the tools to ensure that their Products are used in a limited and safe manner.

295.     As a result of each Defendant's breach of the herein identified duties and resulting negligence, Plaintiff FAS suffered severe physical and mental harm, as well as economic damages,

1  from Plaintiff's use of Defendants' respective Products.

2      296.    Each Defendant's breach of duty of care to Plaintiff FAS was a substantial factor in

3  causing harm to Plaintiff and is the actual and proximate cause of said harm.

4      297.    As a direct and proximate result of each Defendant's negligence, Plaintiff FAS

5  suffered significant injury, harm, damages, and economic loss, and will continue to suffer such harm,

6  damages, and economic loss in the future. .FAS's injuries are permanent and will require more

7  medical care and treatment in the future.

8      298.    Each Defendant's actions and omissions as alleged in this Complaint were intentional,

9  oppressive, malicious, reckless, wanton, fraudulent, beyond all standards of decency, and without

10  regard for human life or Plaintiff FAS's rights, thereby warranting the imposition of punitive

11  damages. Thus, Plaintiff seeks actual and punitive damages according to proof.

12  

**COUNT VI – STATUTORY NEGLIGENCE**

13  **(Cal. Civ. Code § 1714)**

14  **(Against Defendants, Epic Games, , Microsoft in its capacity as a manufacturer of Minecraft,**

15  **and DOES 1-50)**

16      299.    Plaintiff FAS realleges and incorporates by reference all the foregoing allegations of

17  every paragraph of this Complaint as if repeated in full here.

18      300.    Defendants had a duty to exercise ordinary care and caution for the safety of

19  individuals using their Products, including FAS.

20      301.    Defendants, in their role as product designers, developers, manufacturers, marketers,

21  and sellers, and otherwise engaged in activity culminating in placing their Products into the stream

22  of commerce, owed a duty to exercise ordinary care and act as a reasonably careful company would

23  under the circumstances.

24      302.    Defendants owed a duty to avoid engaging in conduct they knew, or reasonably should

25  have known, would cause injury to their users, including Plaintiff FAS

26      303.    Defendants breached those duties.

27      304.    Defendants each negligently, recklessly, and/or carelessly created a harmful and

28  addictive Product and failed to engage in the development of a safer alternative design.

305.     Defendants knew, or should have known, that their Products are harmful, capable of causing extensive physical, mental, emotional, and financial or economic harm and damage, and that minor users are developing disordered and addicted use.

306.     Defendants were and are negligent in failing to provide adequate warnings about the dangers associated with using their Products and in failing to warn users, and the parents of users who are minors, including FAS about how and when, if ever, to safely use their Products.

307.     Defendants were and are negligent in failing to adequately provide users, and their caregivers in the case of users who are minors, including FAS, the tools to ensure that their Products are used in a limited and safe manner.

308.     As a result of each Defendant's breach of the herein identified duties and resulting negligence, Plaintiff FAS suffered severe physical and mental harm, as well as economic damages, from Plaintiff's use of Defendants' respective Products.

309.     Each Defendant's breach of duty of care to Plaintiff FAS was a substantial factor in causing harm to Plaintiff and is the actual and proximate cause of said harm.

310.     As a direct and proximate result of each Defendant's negligence, Plaintiff FAS suffered significant injury, harm, damages, and economic loss, and will continue to suffer such harm, damages, and economic loss in the future. FAS's injuries are permanent and will require more medical care and treatment in the future.

311.     Each Defendant's actions and omissions as alleged in this Complaint were intentional, oppressive, malicious, reckless, wanton, fraudulent, beyond all standards of decency, and without regard for human life or Plaintiff FAS's rights, thereby warranting the imposition of punitive damages, Thus, Plaintiff seeks actual and punitive damages according to proof.

## COUNT VII – INTENTIONAL MISREPRESENTATION
### (Cal. Civ. Code § 1710(1))
**(Against Defendants , Epic Games, , Microsoft in its capacity as a manufacturer of Minecraft, and DOES 1-50)**

312.     Plaintiff FAS realleges and incorporates by reference all the foregoing allegations of every paragraph of this Complaint as if repeated in full here.

313.    At all relevant times, each Defendant was engaged in the business of designing, developing, managing, operating, testing, producing, manufacturing, labeling, marketing, advertising, promoting, controlling, supplying, leasing, selling, and/or otherwise distributing their respective video game Products used by FAS, each of which are defective and unreasonably dangerous.

314.    As detailed herein, Defendants knew about the defective conditions of their respective Products and that the Products posed serious health risks to users, particularly minors.

315.    Defendant Corp. designed with addictive psychological features to keep users playing more often and for longer periods of time, while knowing that abuse and compulsive use by youth can lead to injury but concealed this information from the public and Product users, including Plaintiff FAS.

316.    Defendant Epic Games designed Fortnite with addictive psychological features to keep users playing more often and for longer periods of time, while knowing that abuse and compulsive use by youth can lead to injury but concealed this information from the public and Product users, including Plaintiff FAS.

317.    Defendants Microsoft designed Minecraft with addictive psychological features to keep users playing more often and for longer periods of time, while knowing that abuse and compulsive use by youth can lead to injury, but concealed this information from the public and Product users, including Plaintiff FAS.

318.    Defendants knew of the risks associated with the use of their respective Products based on internal research and external studies known within the industry.

319.    Each Defendant could have disclosed the defective condition of their respective Products to the public and could have advised that the Products posed serious health risks to users, particularly youth. No Defendant took such action; instead, each Defendant opted to omit the safety risks from any disclosures of marketing practices.

320.    Defendants knowingly and intentionally misrepresented that their Products were safe for use, and safe as an educational tool, to further entice users to continue engaging with their Products, including Plaintiff FAS.

COMPLAINT FOR DAMAGES AND DEMAND FOR JURY TRIAL

321.     Defendant Roblox Corp. stated that it has "built a platform with safety at the foundation," that it has a "commitment to safety and civility," and that it consulted "child development experts" in creating recommendations for its Product.

322.     Defendant Epic Games stated that it wants its Product to be a "safe place for [users]" and that its Product is educational and safe for use in classrooms.

323.     Defendants Microsoft and stated that they will "hold [them]selves accountable for making Minecraft as safe as possible for everyone."

324.     Each Defendant intended for users, including Plaintiff FAS, to rely on their representations that their respective Products were safe for use to keep users engaging with their Products and increase their profits, and purposefully marketed their Products to minors for that reason.

325.     However, each Defendant had no reasonable grounds to believe that their respective Products were safe given the internal and external research on addiction associated with video game use and given the global recognition of video game addiction. Each Defendant knowingly made false statements about the safety of their respective Products.

326.     Defendants failed to disclose to users, including Plaintiff FAS, that their Products are designed to create and sustain addiction.

327.     Defendants intentionally failed to disclose to users the strategies and features designed and employed in their Products to create and sustain addiction.

328.     Defendants intentionally failed to disclose their addictive strategies and features to entice users to continue gameplay and increase profits.

329.     Defendants affirmatively represented that their Products were safe for use, particularly for minors, while they simultaneously knew that their Products caused addiction and compulsive use.

330.     Defendants intended for users, including Plaintiff FAS, to rely on their representations that their Products were safe for use in order to keep users engaging with their Products and increase their profits, and purposefully marketed their Products to minors for that reason.

331.     Had Plaintiff been aware that the Products could cause significant harm such as aggressive behavior, verbal memory deficiency, depression, lowered cognitive abilities, sleeping

COMPLAINT FOR DAMAGES AND DEMAND FOR JURY TRIAL

disorders, anxiety, and behavioral addiction disorders, Jennifer Sawyer would not have purchased or allowed FAS to use or continue to use Defendant's respective Product. Likewise, FAS would not have used or continued to use Defendants' Products. Alternatively, if Defendants had adequately warned or instructed FAS's guardian and/or FAS, they would have taken precautions when using Defendant's respective Product in order to eliminate or mitigate the risk of harm.

332.    Plaintiff FAS and Plaintiff's guardian were unaware of the dangerous and addictive nature of Defendant's Products. Plaintiff reasonably relied on Defendant's representations that its Products were safe for use, particularly for minors.

333.    Plaintiff FAS and Plaintiff's guardian reasonably relied on Defendants' representations and did not know, nor had any way of knowing, about the misrepresentations about Defendants' Products.

334.    A reasonable person, including Plaintiff FAS and Plaintiff's guardian, would find information that impacted the users' health, safety, and well-being – such as the serious adverse health risks associated with the use of Defendants' Products – to be important when deciding whether to use, or to continue to use, those Products. Thus, Plaintiff FAS and Plaintiff's guardian justifiably relied on each Defendant's misrepresentations that the Products were safe when purchasing, downloading, playing, continuing to use, and/or purchasing downloadable game content.

335.    Because of Plaintiff FAS's and Plaintiff's guardian's reasonable reliance on each Defendant's representations, Plaintiff sustained physical and psychological harm, as well as economic damages.

336.    As a direct and proximate result of each Defendant's material misrepresentations and false statements, Plaintiff FAS suffered significant injury, harm, damages, and economic loss, and will continue to suffer such harm, damages, and economic loss in the future. FAS's injuries are permanent and will require more medical care and treatment in the future.

337.    Each Defendant's actions and omissions as alleged in this Complaint were intentional, oppressive, malicious, reckless, wanton, fraudulent, beyond all standards of decency, and without regard for human life or Plaintiff FAS's rights, thereby warranting the imposition of punitive damages. Thus, Plaintiff seeks actual and punitive damages according to proof.

COMPLAINT FOR DAMAGES AND DEMAND FOR JURY TRIAL

## COUNT VIII – NEGLIGENT MISREPRESENTATION

### (Cal. Civ. Code § 1710(2))

### (Against Defendants  Epic Games,  Microsoft in its capacity as a manufacturer of Minecraft, and DOES 1-50)

338.    Plaintiff FAS realleges and incorporates by reference all the foregoing allegations of every paragraph of this Complaint as if repeated in full here.

339.    At all relevant times, each Defendant was engaged in the business of designing, developing, managing, operating, testing, producing, manufacturing, labeling, marketing, advertising, promoting, controlling, supplying, leasing, selling, and/or otherwise distributing their respective video game Products used by FAS, each of which are defective and unreasonably dangerous.

340.    As detailed herein, Defendants knew about the defective conditions of their respective Products and that the Products posed serious health risks to users, particularly minors.

341.    Defendant Epic Games designed Fortnite with addictive psychological features to keep users playing more often and for longer periods of time, while knowing that abuse and compulsive use by youth can lead to injury but concealed this information from the public and Product users, including Plaintiff FAS.

342.    Defendants Microsoft designed Minecraft with addictive psychological features to keep users playing more often and for longer periods of time, while knowing that abuse and compulsive use by youth can lead to injury but concealed this information from the public and Product users, including Plaintiff FAS.

343.    Defendants knew of the risks associated with the use of their Products based on internal research and external studies known within the industry.

344.    Each Defendant could have disclosed the defective condition of their respective Products to the public and could have advised that the Products posed serious health risks to users, particularly youth. No Defendant took such action; instead, each Defendant opted to omit the safety risks from any disclosures of marketing practices.

345.    Defendants knowingly and intentionally misrepresented that their Products were safe for use, and safe as an educational tool, to further entice users to continue engaging with their Products, including Plaintiff FAS.

346.    Defendant Epic Games stated that it wants its Product to be a "safe place for [users]" and that its Product is educational and safe for use in classrooms.

347.    Defendants Microsoft stated that they will "hold [them]selves accountable for making Minecraft as safe as possible for everyone."

348.    Each Defendant intended for users, including Plaintiff FAS and Plaintiff's guardian, to rely on their representations that their respective Products were safe for use to keep users engaging with their Products and increase their profits, and purposefully marketed their Products to minors for that reason.

349.    However, each Defendant had no reasonable grounds to believe that their respective Products were safe given the internal and external research on addiction and given the global recognition of video game addiction. Each Defendant made false statements about the safety of their respective Products.

350.    Defendants failed to disclose to users, including Plaintiff FAS and Plaintiff's guardian, that their Products are designed to create and sustain addiction.

351.    Defendants failed to disclose to users the strategies and features designed and employed in their Products to create and sustain addiction.

352.    Defendants failed to disclose their addictive strategies and features to entice users to continue gameplay and increase profits.

353.    Defendants affirmatively represented that their Products were safe for use, particularly for minors, while they simultaneously knew, or reasonably should have known, that their Products caused addiction and compulsive use.

354.    Defendants intended for users, including Plaintiff FAS and Plaintiff's guardian, to rely on their representations that their Products were safe for use to keep users engaging with their Products and increase their profits, and purposefully marketed their Products to minors for that reason.

COMPLAINT FOR DAMAGES AND DEMAND FOR JURY TRIAL

355.     If each Defendant had not concealed, omitted, and misrepresented facts regarding the safety of their Products, and had Plaintiff been aware that the Products could cause significant harm such as aggressive behavior, verbal memory deficiency, depression, lowered cognitive abilities, sleeping disorders, anxiety, and behavioral addiction disorders, Jennifer Sawyer would not have purchased or allowed FAS to use or continue to use Defendant's respective Product. Likewise, FAS would not have used or continued to use Defendants' Products. Alternatively, if Defendants had adequately warned or instructed FAS's guardian and/or FAS, they would have taken precautions when using Defendant's respective Product to eliminate or mitigate the risk of harm.

356.     Plaintiff FAS and Plaintiff's guardian were unaware of the dangerous and addictive nature of Defendant's Products. Plaintiff reasonably relied on Defendant's representations that its Products were safe for use, particularly for minors.

357.     Plaintiff FAS and Plaintiff's guardian reasonably relied on Defendants' representations and did not know, nor had any way of knowing, about the misrepresentations about Defendants' Products.

358.     A reasonable person, including Plaintiff FAS and Plaintiff's guardian, would find information that impacted the users' health, safety, and well-being – such as the serious adverse health risks associated with the use of Defendants' Products – to be important when deciding whether to use, or to continue to use, those Products. Thus, Plaintiff FAS and Plaintiff's guardian justifiably relied on each Defendant's misrepresentations that the Products were safe when purchasing, downloading, playing, continuing to use, and/or purchasing downloadable game content.

359.     Because of Plaintiff FAS's and Plaintiff's guardian's reasonable reliance on each Defendant's representations, Plaintiff sustained physical and psychological harm, as well as damages.

360.     Defendants' misrepresentations were a substantial factor in causing harm to Plaintiff FAS, who suffered significant injury, harm, damages, and economic loss, and will continue to suffer such harm, damages, and economic loss in the future. Thus, Plaintiff seeks actual damages according to proof.

///

///

**COUNT IX – FRAUD**

**(Against Defendants  Epic Games, Microsoft in its capacity as a manufacturer of Minecraft, and DOES 1-50)**

361.    Plaintiff FAS realleges and incorporates by reference all of the foregoing allegations as if repeated in full here.

362.    At all relevant times, each Defendant was engaged in the business of designing, developing, managing, operating, testing, producing, manufacturing, labeling, marketing, advertising, promoting, controlling, supplying, leasing, selling, and/or otherwise distributing their respective video game Products used by FAS, each of which are defective and unreasonably dangerous.

363.    As detailed herein, each Defendant knew about the defective conditions of its Products and that the Products posed serious health risks to users, particularly minors, young adults, and neurodivergent individuals.

364.    Each Defendant knew their Products posed risks to minors, like FAS, based on internal research and external studies known in the industry and to each Defendant; yet each Defendant misrepresented the safety and value of their games for the purpose of inducing users, like FAS, to purchase/download the game and to continue using Defendants' Products and encourage the addiction knowingly caused by Defendants' Products.

365.    Defendant Epic Games designed Fortnite with addictive psychological features to keep users playing more often and for longer periods of time, while knowing that abuse and compulsive use by youth can lead to injury but concealed this information from the public and Product users, including Plaintiff FAS and Plaintiff's guardian.

366.    Defendants Microsoft designed Minecraft with addictive psychological features to keep users playing more often and for longer periods of time, while knowing that abuse and compulsive use by youth can lead to injury but concealed this information from the public and Product users, including Plaintiff FAS and Plaintiff's guardian.

367.    Each Defendant could have disclosed the defective condition of their Products to the public and could have advised that the Products posed serious health risks to users, particularly youth.

No Defendant took such action; instead, each Defendant opted to omit the safety risks from any disclosures or marketing practices.

368.    Defendants knowingly and intentionally misrepresented that their Products were safe for use to further entice users to continue engaging with their Products, including Plaintiff FAS

369.    Each Defendant intended for users, including Plaintiff FAS and Plaintiff's guardian, to rely on their representations that their respective Products were safe for use to keep users engaging with their Products and increase their profits, and purposefully marketed their Products to minors for that reason.

370.    If each Defendant had not concealed, omitted, and misrepresented facts regarding the safety of their Products, and had Plaintiff been aware that the Products could cause significant harm such as aggressive behavior, verbal memory deficiency, depression, lowered cognitive abilities, sleeping disorders, anxiety, and behavioral addiction disorders, Jennifer Sawyer would not have purchased or allowed FAS to use or continue to use Defendant's respective Product. Likewise, FAS would not have used or continued to use Defendants' Products. Alternatively, if Defendants had adequately warned or instructed FAS's guardian and/or FAS, they would have taken precautions when using Defendant's respective Product to eliminate or mitigate the risk of harm.

371.    However, each Defendant had no reasonable grounds to believe that their respective Products were safe given the internal and external research on addiction and given the global recognition of video game addiction. Each Defendant knowingly made false statements about the safety of their respective Products.

372.    As a direct and proximate result of each Defendant's material omissions, Plaintiff FAS and Plaintiff's guardian had no reason to believe that each of Defendant's Products were unsafe for children to use.

373.    Plaintiff FAS and Plaintiff's guardian reasonably relied on each Defendant's misrepresentations that each of their Products was safe for use.

374.    A reasonable person, including Plaintiff FAS and Plaintiff's guardian, would find information that impacted the users' health, safety, and well-being – such as the serious adverse health risks associated with the use of Defendants' Products – to be important when deciding whether to

use, or to continue to use, those Products. Thus, Plaintiff FAS and Plaintiff's guardian justifiably relied on each Defendant's misrepresentations that the Products were safe when purchasing, downloading, playing, continuing to use, and/or purchasing downloadable game content.

375.    As a direct and proximate result of each Defendant's material misrepresentations and false statements, Plaintiff FAS suffered significant injury, harm, damages, and economic loss, and will continue to suffer such harm, damages, and economic loss in the future. FAS's injuries are permanent and will require more medical care and treatment in the future.

376.    Each Defendant's actions and omissions as alleged in this Complaint were intentional, oppressive, malicious, reckless, wanton, fraudulent, beyond all standards of decency, and without regard for human life or Plaintiff FAS's rights, thereby warranting the imposition of punitive damages. Thus, Plaintiff seeks actual and punitive damages according to proof.

### <u>COUNT X – VIOLATION OF CALIFORNIA'S UNFAIR COMPETITION LAW</u>

**(Cal. Bus. & Prof. Code §§ 17200 *et seq*.)**

**(Against Defendants, Epic Games, Microsoft in its capacity as a manufacturer of Minecraft, and DOES 1-50)**

377.    Plaintiff FAS realleges and incorporates by reference all the foregoing allegations of every paragraph of this Complaint as if repeated in full here.

378.    Defendants are corporations, and thus each of them is a "person," as defined by California Business & Professions Code § 17201.

379.    California's Unfair Competition Law ("UCL"), Business and Professions Code § 17200, *et seq*., prohibits any "unlawful, unfair or fraudulent business act or practice" and any "unfair, deceptive, untrue or misleading advertising."

380.    By the conduct described in detail above and incorporated herein, each Defendant engaged in unfair and deceptive acts in violation of California's Unfair Competition Law.

381.    Each Defendant knowingly engaged in the production, design, distribution, and sale of the Products to users, including FAS, that were unsafe and addictive, particularly for minors.

382.    Each Defendant promoted their Products to users, especially minor users, while concealing harmful information about the addictive and unsafe nature of said Products.

COMPLAINT FOR DAMAGES AND DEMAND FOR JURY TRIAL

383.    These business practices that Defendants have engaged in are fraudulent and deceptive practices in violation of the UCL.

384.    Defendants' business practices are also unfair in violation of the UCL. Each Defendant's actions are unethical at minimum, and the benefit of employing their deceptive and addictive features does not, in any circumstance, outweigh the harm that Plaintiff FAS suffered.

385.    As a direct and proximate result of the foregoing acts and practices, Defendants have received, or will receive, income, profits, and other benefits, which they would not have received if they had not engaged in the violations of the UCL described herein.

386.    As a direct and proximate result of each Defendant's conduct, Plaintiff FAS sustained economic losses, including hundreds of dollars per year in video game related spending. Had Defendants not engaged in these fraudulent and deceptive practices, Plaintiff would not have sustained the aforementioned economic injuries.

387.    As a result of each Defendant's conduct, Plaintiff FAS sustained significant injuries.

388.    As such, in accordance with the provisions of the California Business and Professions Code §§ 17200 and 17203, Plaintiff requests that this Court enjoin each Defendant from continuing to violate the UCL or violating it in the same fashion in the future, and from continuing to conduct business via the unfair and fraudulent business acts as set forth in this Complaint.

## COUNT XI – STRICT PRODUCT LIABILITY – DESIGN DEFECT

### (Against Defendant Microsoft in its capacity as a developer of the Xbox Platform)

389.    Plaintiff FAS realleges and incorporates by reference each of the preceding paragraphs above as though set forth fully here.

390.    At all relevant times, Defendant was engaged in the business of designing, developing, managing, operating, testing, producing, manufacturing, labeling, marketing, advertising, promoting, controlling, supplying, leasing, selling, and/or otherwise distributing the Xbox Product[48] used by FAS, which is defective and unreasonably dangerous.

---

[48] Defendant Microsoft's Xbox platform may be referred to as "the Product" in Counts XI – XX.

391.     The Product Defendant placed into the stream of commerce was defectively designed. The Product was designed to cause addictive and compulsive use, including by minors. The Product is not reasonably fit, suitable, or safe for its intended purpose.

392.     The defective condition of the Xbox Product rendered it unreasonably dangerous and/or not reasonably safe. The foreseeable risks outweigh the benefits associated with the Product's design.

393.     The defects in the Product were present in the Product when it left the hands of Defendant and when it was released to the general public to be used in an intended and foreseeable manner.

394.     Defendant's Product, as designed, was unreasonably dangerous, posed a substantial likelihood of harm, and was therefore defective because of the reasons enumerated in this Complaint, including, but not limited to, the Product's design including addictive operant conditioning, the Product's design lacking warnings about the risk of addiction, the Product's design lacking safeguards such as easily available user-imposed time restrictions on gameplay, the Product's design lacking proper minor age verification, and the Product failing to operate as a reasonable user would expect.

395.     Defendant designed its Product to be addictive and take advantage of the chemical reward system of users' brains to establish compulsive use and addiction.

396.     Defendant's Product was expected to and did reach Plaintiff without substantial change in the condition in which it was designed, manufactured, labeled, marketed, promoted, supplied, and otherwise released into the stream of commerce.

397.     FAS used Defendant's Product in an intended and reasonably foreseeable manner, and the Product was not materially altered prior to its use.

398.     Defendant's defective Product was the direct and proximate cause of FAS's injuries and harm that include, but are not limited to, emotional distress, diminished social interactions, lack of interest in other hobbies, withdrawal symptoms such as rage, anger, and physical outbursts.

399.     FAS used Defendant's Product in its intended and reasonably foreseeable manner.

400.   Defendant knew or, by the exercise of reasonable care, should have known that minors, including FAS, would use its Product without anyone inspecting the Product for addictive or other dangerous features.

401.   Reasonable users of Defendant's Product would not expect, and Plaintiff herein did not expect, that said Product would pose risks of severe physical and mental harm.

402.   Reasonable users of Defendant's Product would not expect that Defendant knew about risks of severe physical and mental harm and nevertheless chose to place its Product into the stream of commerce.

403.   Defendant could have utilized cost effective, reasonably feasible alternative designs to minimize these harms, such as by designing its Product without the harm causing features listed above while still providing an optimal gaming experience.

404.   At the time Defendant's Product was designed, developed, distributed to FAS, and played, safer alternative designs existed that were entirely feasible.

405.   Defendant could have utilized cost effective, reasonably feasible alternative designs to minimize harm caused by its Product by implementing elements that include, but are not limited to:

   a.   Robust age verification;

   b.   Effective parental controls;

   c.   The removal of barriers to the enactment of parental controls;

   d.   Warnings of health effects of use and extended use;

   e.   Opt-in restrictions to the length and frequency of sessions;

   f.   Self-limiting tools, including but not limited to session time notifications, warnings, or reports.

   g.   Self-Imposed limits for microtransactions; and

   h.   Others as set forth herein.

406.   Instead, Defendant designed its Product to aggressively addict users with features that increase use time, frequency of use, and profit to Defendant, all to the detriment of users' wellbeing.

COMPLAINT FOR DAMAGES AND DEMAND FOR JURY TRIAL

407.     Plaintiff FAS's injuries—physical, emotional, and economic—were reasonably foreseeable to Defendant at the time of the Product's design, marketing, and operation.

408.     Plaintiff FAS was injured as a direct and proximate result of Defendant's placement of its Product into the stream of commerce, Plaintiff's use of the Product as intended and designed, and the Product's defective design described herein.

409.     As a direct and proximate result of Defendant's defective Product, Plaintiff FAS suffered significant injury, harm, damages, and economic loss, and will continue to suffer such harm, damages, and economic loss in the future. FAS's injuries are permanent and will require more medical care and treatment in the future.

410.     Defendant's actions and omissions as alleged in this Complaint were intentional, oppressive, malicious, reckless, wanton, fraudulent, beyond all standards of decency, and without regard for human life or Plaintiff FAS's rights, thereby warranting the imposition of punitive damages. Thus, Plaintiff seeks actual and punitive damages according to proof.

## COUNT XII – STRICT PRODCUT LIABILITY – FAILURE TO WARN

### (Against Defendant Microsoft in its capacity as a developer of the Xbox Platform)

411.     Plaintiff realleges and incorporates by reference all of the foregoing allegations of every paragraph of this Complaint as if repeated in full here.

412.     At all relevant times, Defendant was engaged in the business of designing, developing, managing, operating, testing, producing, manufacturing, labeling, marketing, advertising, promoting, controlling, supplying, leasing, selling, and/or otherwise distributing the Xbox Product used by FAS, which is defective and unreasonably dangerous.

413.     Defendant knew, or should have known, that ordinary consumers such as Plaintiff would not have realized the potential risks of the Product. Defendant's Product is highly addictive and likely to cause mental and physical injuries as listed above.

414.     Defendant knew, or should have known, that the use of its Product was dangerous, harmful, and injurious when used by Plaintiff in a reasonably foreseeable manner.

415.     Defendant knew that its Product was and is harmful, capable of causing and in fact was designed to cause compulsive, addictive use, particularly in minors, and that such use could result in severe physical, mental, and emotional injuries.

416.     Defendant owed a duty to warn consumers of the foreseeable risks and dangers of the Product that the Defendant knew were present but not obvious or known to users, especially underage users, or their caregivers, or any average member of the consuming public.

417.     Upon information and belief, Defendant failed to include any warning or instructions regarding the herein identified risks and dangers – to minors and others – of using Defendant's Product in its intended and foreseeable manner.

418.     At the time Defendant's Product left Defendant's control, it did not include – nor has it ever included – a warning that the Product poses an unreasonable risk of harm to users, particularly minors.

419.     Defendant failed to provide timely and adequate warnings, instructions, and information by, including but not limited to:

   a.   failing to ensure the Product included warnings regarding its addictive design that were accurate, conspicuous, and adequate, despite having extensive knowledge of the risks associated with its use;

   b.   failing to conduct adequate pre-and-post-market safety testing such that an adequate warning could have been issued to users;

   c.   failing to include adequate and conspicuous warnings that would alert users to the dangerous risks of the Product, including but not limited to the risks of causing severe and life-altering physical, mental, and emotional disorders and behaviors in minors, especially those with neurodivergent qualities;

   d.   failing to issue warnings to consumers regarding the dangerous risks of the Product even after its purchase; and

   e.   representing that the Product was and is safe for use, when in fact, Defendant knew or should have known that its Product was designed to

- 69 -

COMPLAINT FOR DAMAGES AND DEMAND FOR JURY TRIAL

1    cause minors to engage in excessive use until they developed an

2    addiction or disordered compulsion to use the Product.

3    420.    Moreover, Defendant breached its duty of care owed to Plaintiff through its non-

4  feasance, failure to act, and omissions in the development, setup, management, maintenance,

5  operation, marketing, advertising, promotion, supervision, and control of its Product. Those

6  breaches include but are not limited to:

7    a.  designing the Product to be more addictive and to target specific individuals

8       based on information obtained and retained by Defendant and/or third-

9       parties;

10    b.  failing to implement effective parental controls;

11    c.  failing to implement reasonably available means for users or their parents to

12       limit or deter their own excessive frequency or duration of use; and

13    d.  failing to implement reasonably available means to set an overall spending

14       limit for minors on downloadable content on the Xbox Product.

15    421.    Defendant's failure to adequately warn about its defective Product created a danger of

16  injuries described herein that were reasonably foreseeable at the time of the design, development, and

17  dissemination of the Product.

18    422.    A reasonable company under the same or similar circumstances would have warned

19  and instructed Plaintiff of these dangers.

20    423.    Had Plaintiff been aware that the Product could cause significant harm such as

21  aggressive behavior, verbal memory deficiency, depression, lowered cognitive abilities, sleeping

22  disorders, anxiety, and behavioral addiction disorders, Jennifer Sawyer would not have purchased or

23  allowed FAS to use or continue to use Defendant's Product. Likewise, FAS would not have used or

24  continued to use Defendant's Product. Alternatively, if Defendants had adequately warned or

25  instructed FAS's guardian and/or FAS, they would have taken precautions when using Defendant's

26  Product in order to eliminate or mitigate the risk of harm.

27    424.    Plaintiff FAS was injured as a direct and proximate cause of Defendant's failure to

28  warn about its Product. Had Plaintiff been aware that the Product could cause significant harm such

as aggressive behavior, verbal memory deficiency, depression, lowered cognitive abilities, sleeping disorders, anxiety, and behavioral addiction disorders, Jennifer Sawyer would not have purchased or allowed FAS to use or continue to use Defendant's Product. Likewise, FAS would not have used or continued to use Defendant's Product. Alternatively, if Defendant had adequately warned or instructed FAS's guardian and/or FAS, they would have taken precautions when using Defendant's Product in order to eliminate or mitigate the risk of harm.

425.    As a direct and proximate result of Defendant's defective product, Plaintiff FAS suffered significant injury, harm, damages, and economic loss, and will continue to suffer such harm, damages, and economic loss in the future. FAS's injuries are permanent and will require more medical care and treatment in the future.

426.    Each Defendant's actions and omissions as alleged in this Complaint were intentional, oppressive, malicious, reckless, wanton, fraudulent, beyond all standards of decency, and without regard for human life or Plaintiff FAS's rights, thereby warranting the imposition of punitive damages. Thus, Plaintiff seeks actual and punitive damages according to proof.

## COUNT XIII – NEGLIGENCE – DESIGN

### (Against Defendant Microsoft in its capacity as a developer of the Xbox Platform)

427.    Plaintiff FAS realleges and incorporates by reference all of the foregoing allegations of every paragraph of this Complaint as if repeated in full here.

428.    At all relevant times, Defendant was engaged in the business of designing, developing, managing, operating, testing, producing, manufacturing, labeling, marketing, advertising, promoting, controlling, supplying, leasing, selling, and/or otherwise distributing its Product used by FAS, which are defective and unreasonably dangerous.

429.    Defendant knew, or should have known, that the use of its Product was dangerous, harmful, and injurious when used by Plaintiff in a reasonably foreseeable manner.

430.    Defendant knew, or should have known, that ordinary consumers such as Plaintiff FAS would not have realized the potential risks and dangers of its Product. Defendant's Product is likely to cause mental and physical injuries as listed above.

431.    Defendant owed a duty to all reasonably foreseeable users to design a safe product.

432.    Defendant's Product as designed was unreasonably dangerous, posed a substantial likelihood of harm, and was therefore defective because of the reasons enumerated in this Complaint, including, but not limited to the creation of a Product that does not contain warnings about the potential harm of use, the creation of a Product without proper minor age verification, and because the Product created failed to operate as a reasonable user would expect.

433.    Defendant breached its duty by failing to use reasonable care in the design of its Product by negligently designing its Product to specifically appeal to minors, who were particularly unable to appreciate the risks of the Product.

434.    Defendant breached its duty by failing to use cost effective, reasonably feasible alternative designs that would make the product less harmful to minors, including but not limited to:

      a.   Robust age verification;

      b.   Effective parental controls;

      c.   The removal of barriers to the enactment of parental controls;

      d.   Warnings of health effects of use and extended use upon sign-up;

      e.   Opt-in restrictions to the length and frequency of sessions;

      f.   Self-limiting tools, including but not limited to session time notifications, warnings, or reports.

      g.   Self-imposed limits for microtransactions; and

      h.   Others as set forth herein.

435.    Defendant breached its duty by failing to use cost effective, reasonably feasible alternative designs that could have reduced mental and physical harm to users, especially youth. Instead, Defendant designed a Product that increased addictiveness, use time, frequency of use, and engagement with the Product.

436.    A reasonable company under the same or similar circumstances would have designed a safer product.

437.    Plaintiff was harmed directly and proximately by the Defendant's failure to use reasonable care in the design of its Product.

COMPLAINT FOR DAMAGES AND DEMAND FOR JURY TRIAL

438.    As a direct and proximate result of Defendant's negligence, Plaintiff FAS suffered significant injury, harm, damages, and economic loss, and will continue to suffer such harm, damages, and economic loss in the future. FAS's injuries are permanent and will require more medical care and treatment in the future.

439.    The Defendant's actions and omissions as alleged in this Complaint were intentional, oppressive, malicious, reckless, wanton, fraudulent, beyond all standards of decency, and without regard for human life or Plaintiff FAS's rights, thereby warranting the imposition of punitive damages. Thus, Plaintiff seeks actual and punitive damages according to proof.

### COUNT XIV – NEGLIGENCE – FAILURE TO WARN

**(Against Defendant Microsoft in its capacity as a developer of the Xbox Platform)**

440.    Plaintiff FAS realleges and incorporates by reference all the foregoing allegations of every paragraph of this Complaint as if repeated in full here.

441.    At all relevant times, Defendant was engaged in the business of designing, developing, managing, operating, testing, producing, manufacturing, labeling, marketing, advertising, promoting, controlling, supplying, leasing, selling, and/or otherwise distributing its Product used by FAS, which is defective and unreasonably dangerous.

442.    Defendant knew, or should have known, that the use of Defendant's Product was dangerous, harmful, and injurious when used by Plaintiff in a reasonably foreseeable manner.

443.    Defendant knew or, by the exercise of reasonable care should have known, that its Product posed risks of harm to youth. These risks were known and knowable considering Defendant's own internal information and knowledge regarding its Product at the time of the Product's development, design, marketing, promotion, advertising, and distribution to FAS

444.    Defendant knew, or should have known, that ordinary consumers such as Plaintiff would not have realized the potential risks and dangers of Defendant's Product. Defendant's Product is highly addictive and likely to cause mental and physical injuries as listed above.

445.    Defendant's Product, as identified herein, does not contain a warning, nor has it ever contained a warning that its Product poses an unreasonable risk of harm to users, particularly minors. Defendant's Product did not contain a warning of these risks when the Product left its possession.

446. Had Plaintiff been aware that the Product could cause significant harm such as aggressive behavior, verbal memory deficiency, depression, lowered cognitive abilities, sleeping disorders, anxiety, and behavioral addiction disorders, Jennifer Sawyer would not have purchased or allowed FAS to use or continue to use Defendant's Product. Likewise, FAS would not have used or continued to use Defendant's Product. Alternatively, if Defendants had adequately warned or instructed FAS's guardian and/or FAS, they would have taken precautions when using Defendant's Product in order to eliminate or mitigate the risk of harm.

447. Defendant had a duty to give reasonable and adequate warnings of dangers inherent or reasonably foreseeable in the use of its Product in a manner which the manufacturer should reasonably foresee.

448. Defendant breached its duty owed to foreseeable users. That breach includes a failure to warn users that Defendant's Product causes compulsive use and/or other physical and mental injuries.

449. A reasonable company under the same or similar circumstances would have used reasonable care to provide adequate warnings to consumers, and parents of minor consumers.

450. As a direct and proximate result of Defendant's breach of duty to provide adequate warnings, Plaintiff FAS was harmed and sustained the injuries set forth herein.

451. As a direct and proximate result of Defendant's negligence, Plaintiff FAS suffered significant injury, harm, damages, and economic loss, and will continue to suffer such harm, damages, and economic loss in the future. FAS's injuries are permanent and will require more medical care and treatment in the future.

452. The Defendant's actions and omissions as alleged in this Complaint were intentional, oppressive, malicious, reckless, wanton, fraudulent, beyond all standards of decency, and without regard for human life or Plaintiff FAS's rights, thereby warranting the imposition of punitive damages. Thus, Plaintiff seeks actual and punitive damages according to proof.

///

///

///

1    **<u>COUNT XV – NEGLIGENCE - ORDINARY</u>**

2    **(Against Defendant Microsoft in its capacity as a developer of the Xbox Platform)**

3    453.    Plaintiff FAS realleges and incorporates by reference all the foregoing allegations of

4    every paragraph of this Complaint as if repeated in full here.

5    454.    Defendant, in its role as a product designer, developer, manufacturer, marketer, and

6    seller engaged in activity culminating in placing its Product into the stream of commerce, had a duty

7    to exercise ordinary care and act as a reasonably careful company would under the circumstances.

8    455.    Defendant had a duty to exercise ordinary care and caution for the safety of individuals

9    using its Product, including FAS.

10    456.    Defendant had a duty to avoid engaging in conduct it knew, or reasonably should have

11    known, would cause injury to its users, including Plaintiff FAS.

12    457.    Defendant breached these duties.

13    458.    Defendant negligently, recklessly, and/or carelessly created a harmful and addictive

14    Product and failed to engage in the development of a safer alternative design.

15    459.    Defendant knew, or should have known, that its Product is harmful, capable of causing

16    extensive physical, mental, emotional, and financial or economic harm and damage, and that minor

17    users are developing disordered and addicted use.

18    460.    Defendant was and is negligent in failing to provide adequate warnings about the

19    dangers associated with using its Product and in failing to warn users, and the parents of users who

20    are minors, including FAS, about how and when, if ever, to safely use its Product.

21    461.    Defendant was and is negligent in failing to adequately provide users, and their

22    caregivers in the case of minor users, including FAS, the tools to ensure that its Product is used in a

23    limited and safe manner.

24    462.    As a result of Defendant's breach of the herein identified duties and resulting

25    negligence, Plaintiff suffered severe physical and mental harm, as well as economic damages, from

26    Plaintiff's use of Defendant's Product.

27    463.    Defendant's breach of duty of care to Plaintiff FAS was a substantial factor in causing

28    harm to Plaintiff and is the actual and proximate cause of said harm.

464.     As a direct and proximate result of Defendant's negligence, Plaintiff FAS suffered significant injury, harm, damages, and economic loss, and will continue to suffer such harm, damages, and economic loss in the future. FAS's injuries are permanent and will require more medical care and treatment in the future.

465.     The Defendant's actions and omissions as alleged in this Complaint were intentional, oppressive, malicious, reckless, wanton, fraudulent, beyond all standards of decency, and without regard for human life or Plaintiff FAS's rights, thereby warranting the imposition of punitive damages. Thus, Plaintiff seeks actual and punitive damages according to proof.

## COUNT XVI – STATUTORY NEGLIGENCE

### (Cal. Civ. Code § 1714)

**(Against Defendant Microsoft in its capacity as a developer of the Xbox Platform)**

466.     Plaintiff FAS realleges and incorporates by reference all the foregoing allegations of every paragraph of this Complaint as if repeated in full here.

467.     Defendant, in its role as a product designer, developer, manufacturer, marketer, and seller engaged in activity culminating in placing its Product into the stream of commerce, had a duty to exercise ordinary care and act as a reasonably careful company would under the circumstances.

468.     Defendant had a duty to exercise ordinary care and caution for the safety of individuals using its Product, including FAS

469.     Defendant had a duty to avoid engaging in conduct it knew, or reasonably should have known, would cause injury to its users, including Plaintiff FAS

470.     Defendant breached these duties.

471.     Defendant negligently, recklessly, and/or carelessly created harmful and addictive Product and failed to engage in the development of safer alternative platforms.

472.     Defendant knew, or should have known, that its Product is harmful, capable of causing extensive physical, mental, emotional, and financial or economic harm and damage, and that minor users are developing disordered and addicted use.

473.     Defendant was and is negligent in failing to provide adequate warnings about the dangers associated with using its Product and in failing to warn users, and the parents of users who are minors, including FAS, about how and when, if ever, to safely use their Product.

474.     Defendant was and is negligent in failing to provide users, and their caregivers in the case of users who are minors, including FAS, the tools to ensure that its Product is used in a limited and safe manner.

475.     As a result of Defendant's negligence, Plaintiff FAS suffered severe physical and mental harm, as well as economic damages, from Plaintiff's use of Defendant's Product.

476.     Defendant's breach of duty of care to Plaintiff FAS was a substantial factor in causing harm to Plaintiff and is the actual and proximate cause of said harm.

477.     As a direct and proximate result of Defendant's negligence, Plaintiff FAS suffered significant injury, harm, damages, and economic loss, and will continue to suffer such harm, damages, and economic loss in the future. FAS's injuries are permanent and will require more medical care and treatment in the future.

478.     Defendant's actions and omissions as alleged in this Complaint were intentional, oppressive, malicious, reckless, wanton, fraudulent, beyond all standards of decency, and without regard for human life or Plaintiff FAS's rights, thereby warranting the imposition of punitive damages. Thus, Plaintiff seeks actual and punitive damages according to proof.

## XVII – INTENTIONAL MISREPRESENTATION

**(Against Defendant Microsoft in its capacity as a developer of the Xbox Platform)**

479.     Plaintiff FAS realleges and incorporates by reference all the foregoing allegations of every paragraph of this Complaint as if repeated in full here.

480.     At all relevant times, Defendant was engaged in the business of designing, developing, managing, operating, testing, producing, manufacturing, labeling, marketing, advertising, promoting, controlling, supplying, leasing, selling, and/or otherwise distributing its Product used by FAS, which was defective and unreasonably dangerous.

481.     As detailed herein, Defendant knew about the defective conditions of its Product and that the Product posed serious health risks to users, particularly minors.

482.    Defendant designed its Product with addictive psychological features to keep users playing more often and for longer periods of time, while knowing that abuse and compulsive use by youth can lead to injury, but concealed this information from the public and Product users, including Plaintiff FAS and Plaintiff's guardian.

483.    Defendant knew of the risks associated with the use of its Product based on internal research and external studies known within the industry.

484.    Defendant could have disclosed the defective condition of its Product to the public and could have advised that the Product posed serious health risks to users, particularly youth. Defendant took no such action; instead, Defendant opted to omit the safety risks from any disclosures.

485.    Defendant knowingly and intentionally misrepresented that its Product was safe for use to further entice users to purchase and continue engaging with its Product, including Plaintiff FAS

486.    Defendant stated that "Xbox strives to create a safer gaming experience for you and your family," and that its Xbox Store is "safer for the whole family" to use.

487.    Defendant intended for users, including Plaintiff FAS and Plaintiff's guardian, to rely on its representations that its Product was safe for use to keep users engaging with its Product and increase its profits, and purposefully marketed its Product to minors for that reason.

488.    However, Defendant had no reasonable grounds to believe that its Product was safe given the internal and external research on addiction associated with video game use and given the global recognition of video game addiction. Defendant knowingly made false statements about the safety of its Product.

489.    Defendant failed to disclose to users, including Plaintiff FAS and Plaintiff's guardian, that its Product is designed to create and sustain addiction.

490.    Defendant intentionally failed to disclose to users the strategies and features designed and employed in its Product to create and sustain addiction.

491.    Defendant intentionally failed to disclose its addictive strategies and features to entice users to continue gameplay and increase profits.

COMPLAINT FOR DAMAGES AND DEMAND FOR JURY TRIAL

492.     Defendant affirmatively represented that its Product was safe for use, particularly for minors, while simultaneously knowing that its Product caused addiction and compulsive use.

493.     Defendant intended for users, including Plaintiff FAS and Plaintiff's guardian, to rely on its representations that its Product was safe for use in order to keep users engaging with its Product and increase its profits, and purposefully marketed its Product to minors for that reason.

494.     If Defendant had not concealed, omitted, and misrepresented facts regarding the safety of their Products, Jennifer Sawyer would not have purchased or allowed FAS to use or continue to use Defendant's Product. Likewise, FAS would not have used or continued to use Defendant's Product. Alternatively, if Defendants had adequately warned or instructed FAS's guardian and/or FAS, they would have taken precautions when using Defendant's Product in order to eliminate or mitigate the risk of harm.

495.     Plaintiff FAS and Plaintiff's guardian were unaware of the dangerous and addictive nature of Defendant's Product. Plaintiff reasonably relied on Defendant's representations that its Product was safe for use, particularly for minors.

496.     Plaintiff FAS and Plaintiff's guardian reasonably relied on Defendant's representations and did not know, nor had any way of knowing, about the misrepresentations about Defendant's Product.

497.     A reasonable person, including Plaintiff FAS and Plaintiff's guardian, would find information that impacted the users' health, safety, and well-being – such as the serious adverse health risks associated with the use of Defendant's Product – to be important when deciding whether to use, or to continue to use, that Product. Thus, Plaintiff FAS and Plaintiff's guardian justifiably relied on Defendant's misrepresentations that the Product was safe when purchasing, using, and/or continuing to use Defendant's Product.

498.     Because of Plaintiff FAS's and Plaintiff's guardian's reasonable reliance on Defendant's representations, Plaintiff sustained physical and psychological harm, as well as economic damages.

499.     As a direct and proximate result of Defendant's material misrepresentations and false statements, Plaintiff FAS suffered significant injury, harm, damages, and economic loss, and will

1  continue to suffer such harm, damages, and economic loss in the future. FAS's injuries are permanent

2  and will require more medical care and treatment in the future.

3      500.    Defendant's actions and omissions as alleged in this Complaint were intentional,

4  oppressive, malicious, reckless, wanton, fraudulent, beyond all standards of decency, and without

5  regard for human life or Plaintiff FAS's rights, thereby warranting the imposition of punitive

6  damages. Thus, Plaintiff seeks actual and punitive damages according to proof.

7              **COUNT XVIII– NEGLIGENT MISREPRESENTATION**

8                    **(Cal. Civ. Code § 1710(2))**

9      **(Against Defendant Microsoft in its capacity as a developer of the Xbox Platform)**

10     501.    Plaintiff FAS realleges and incorporates by reference all the foregoing allegations of

11  every paragraph of this Complaint as if repeated in full here.

12     502.    At all relevant times, Defendant was engaged in the business of designing, developing,

13  managing, operating, testing, producing, manufacturing, labeling, marketing, advertising, promoting,

14  controlling, supplying, leasing, selling, and/or otherwise distributing its Product used by FAS, which

15  are defective and unreasonably dangerous.

16     503.    As detailed herein, Defendant knew about the defective conditions of its Product and

17  that the Product posed serious health risks to users, particularly minors.

18     504.    Defendant designed the Xbox Product with addictive psychological features to keep

19  users playing more often and for longer periods of time, while knowing that abuse and compulsive

20  use by youth can lead to injury, but concealed this information from the public and Product users,

21  including Plaintiff C.W and Plaintiff's guardian.

22     505.    Defendant knew of the risks associated with the use of its Product based on internal

23  research and external studies known within the industry.

24     506.    Defendant could have disclosed the defective condition of its Product to the public

25  and could have advised that the Product posed serious health risks to users, particularly youth.

26  Defendant took no such action; instead, Defendant opted to omit the safety risks from any disclosures.

27

28

COMPLAINT FOR DAMAGES AND DEMAND FOR JURY TRIAL

507. Defendant knowingly and intentionally misrepresented that its Product was safe for use, and safe as an educational tool, to further entice users to continue engaging with its Product, including Plaintiff FAS and Plaintiff's guardian.

508. Defendant stated that "Xbox strives to create a safer gaming experience for you and your family," and that its Xbox Store is "safer for the whole family" to use.

509. Defendant intended for users, including Plaintiff FAS, to rely on its representations that its Product was safe for use to keep users engaging with its Product and increase its profits, and purposefully marketed its Product to minors for that reason.

510. However, Defendant had no reasonable grounds to believe that its Product was safe given the internal and external research on addiction associated with video game use and given the global recognition of video game addiction. Defendant made false statements about the safety of its Product.

511. Defendant failed to disclose to users, including Plaintiff FAS and Plaintiff's guardian, that its Product is designed to create and sustain addiction.

512. Defendant failed to disclose to users the strategies and features designed and employed in its Product to create and sustain addiction.

513. Defendant failed to disclose its addictive strategies and features to entice users to continue gameplay and increase profits.

514. Defendant affirmatively represented that its Product was safe for use, particularly for minors, while it simultaneously knew, or reasonably should have known, that its Product caused addiction and compulsive use.

515. Defendant intended for users, including Plaintiff FAS and Plaintiff's guardian, to rely on its representations that its Product was safe for use to keep users engaging with its Product and increase its profits, and purposefully marketed its Product to minors for that reason.

516. If Defendant had not concealed, omitted, and misrepresented facts regarding the safety of its Product, Jennifer Sawyer would not have purchased or allowed FAS to use or continue to use Defendant's Product. Likewise, FAS would not have used or continued to use Defendant's Product. Alternatively, if Defendants had adequately warned or instructed FAS's guardian and/or FAS, they

would have taken precautions when using Defendant's Product in order to eliminate or mitigate the risk of harm.

517.    Plaintiff FAS and Plaintiff's guardian were unaware of the dangerous and addictive nature of Defendant's Product. Plaintiff reasonably relied on Defendant's representations that its Product was safe for use, particularly for minors.

518.    Plaintiff FAS and Plaintiff's guardian reasonably relied on Defendant's representations and did not know, nor had any way of knowing, about the misrepresentations about Defendant's Product.

519.    A reasonable person, including Plaintiff FAS and Plaintiff's guardian, would find information that impacted the users' health, safety, and well-being – such as the serious adverse health risks associated with the use of Defendant's Product – to be important when deciding whether to use, or to continue to use, those Product. Thus, Plaintiff FAS and Plaintiff's guardian justifiably relied on Defendant's misrepresentations that the Product was safe when purchasing, using, and/or continuing to use the Product.

520.    Because of Plaintiff FAS's and Plaintiff's guardian's reasonable reliance on Defendant's representations, Plaintiff sustained physical and psychological harm, as well as economic damages.

521.    Defendant's misrepresentations were a substantial factor in causing harm to Plaintiff FAS, who suffered significant injury, harm, damages, and economic loss, and will continue to suffer such harm, damages, and economic loss in the future. Thus, Plaintiff seeks actual damages according to proof.

## COUNT XIX – FRAUD

### (Against Defendant Microsoft in its capacity as a developer of the Xbox Platform)

522.    Plaintiff FAS realleges and incorporates by reference all of the foregoing allegations as if repeated in full here.

523.    At all relevant times, Defendant was engaged in the business of designing, developing, managing, operating, testing, producing, manufacturing, labeling, marketing, advertising, promoting,

1    controlling, supplying, leasing, selling, and/or otherwise distributing its Product used by FAS, which

2    are defective and unreasonably dangerous.

3    524.    As detailed herein, Defendant knew about the defective conditions of its Product and

4    that the Product posed serious health risks to users, particularly minors, young adults, and

5    neurodivergent individuals.

6    525.    Defendant knew its Product posed risks to minors, like FAS, based on internal research

7    and external studies known in the industry and to Defendant; yet Defendant misrepresented the safety

8    and value of its Product for the purpose of inducing users, like FAS, to purchase its Product, to

9    continue using Defendant's Product, and encourage the addiction knowingly caused by Defendant's

10    Product.

11    526.    Defendant designed the Xbox Product with addictive psychological features to keep

12    users playing more often and for longer periods of time, while knowing that abuse and compulsive

13    use by youth can lead to injury, but concealed this information from the public and Product users,

14    including Plaintiff FAS and Plaintiff's guardian.

15    527.    Defendant could have disclosed the defective condition of its Product to the public

16    and could have advised that the Product posed serious health risks to users, particularly youth.

17    Defendant took no such action; instead, Defendant opted to omit the safety risks from any disclosures

18    or marketing practices.

19    528.    Defendant knowingly and intentionally misrepresented that its Product was safe for

20    use to further entice users to continue engaging with its Product, including Plaintiff FAS and

21    Plaintiff's guardian.

22    529.    Defendant intended for users, including Plaintiff FAS and Plaintiff's guardian, to rely

23    on its representations that its Product was safe for use to keep users engaging with its Product and

24    increase its profits, and purposefully marketed its Product to minors for that reason.

25    530.    If Defendant had not concealed, omitted, and misrepresented facts regarding the safety

26    of its Product, Jennifer Sawyer would not have purchased or allowed FAS to use or continue to use

27    Defendant's Product. Likewise, FAS would not have used or continued to use Defendant's Product.

28    Alternatively, if Defendants had adequately warned or instructed FAS's guardian and/or FAS, they

1  would have taken precautions when using Defendant's Product in order to eliminate or mitigate the

2  risk of harm.

3      531.    However, Defendant had no reasonable grounds to believe that its Product was safe

4  given the internal and external research on addiction and given the global recognition of video game

5  addiction. Defendant knowingly made false statements about the safety of its Product.

6      532.    As a direct and proximate result of Defendant's material omissions, Plaintiff FAS and

7  Plaintiff's guardian had no reason to believe that Defendant's Product was unsafe for children to use.

8      533.    Plaintiff FAS and Plaintiff's guardian reasonably relied on Defendant's

9  misrepresentations that its Product was safe for use.

10      534.    A reasonable person, including Plaintiff FAS and Plaintiff's guardian, would find

11  information that impacted the users' health, safety, and well-being – such as the serious adverse health

12  risks associated with the use of Defendants' Product – to be important when deciding whether to use,

13  or to continue to use, those Product. Thus, Plaintiff FAS and Plaintiff's guardian justifiably relied on

14  Defendant's misrepresentations that the Product was safe when purchasing, using, and/or continuing

15  to use Defendant's Product.

16      535.    As a direct and proximate result of Defendant's material misrepresentations and false

17  statements, Plaintiff FAS suffered significant injury, harm, damages, and economic loss, and will

18  continue to suffer such harm, damages, and economic loss in the future. FAS's injuries are permanent

19  and will require more medical care and treatment in the future.

20      536.    Defendant's actions and omissions as alleged in this Complaint were intentional,

21  oppressive, malicious, reckless, wanton, fraudulent, beyond all standards of decency, and without

22  regard for human life or Plaintiff FAS's rights, thereby warranting the imposition of punitive

23  damages. Thus, Plaintiff seeks actual and punitive damages according to proof.

24      **COUNT XX – VIOLATION OF CALIFORNIA'S UNFAIR COMPETITION LAW**

25      **(Cal. Bus. & Prof. Code §§ 17200 *et seq*.)**

26      **(Against Defendant Microsoft in its capacity as a developer of the Xbox Platform)**

27      537.    Plaintiff FAS realleges and incorporates by reference all the foregoing allegations of

28  every paragraph of this Complaint as if repeated in full here.

538.    Defendant is a corporation, and thus is a "person," as defined by California Business & Professions Code § 17201.

539.    California's Unfair Competition Law ("UCL"), Business and Professions Code § 17200, *et seq*., prohibits any "unlawful, unfair or fraudulent business act or practice" and any "unfair, deceptive, untrue or misleading advertising."

540.    By the conduct described in detail above and incorporated herein, Defendant engaged in unfair and deceptive acts in violation of California's Unfair Competition Law.

541.    Defendant knowingly engaged in the production, design, distribution, and sale of the Product to users, including FAS, that was unsafe and addictive, particularly for minors.

542.    Defendant promoted its Product to users, especially minor users, while concealing harmful information about the addictive and unsafe nature of said Product.

543.    These business practices that Defendant has engaged in are fraudulent and deceptive practices in violation of the UCL.

544.    Defendant's business practices are also unfair in violation of the UCL. Defendant's actions are unethical at minimum, and the benefit of employing its deceptive and addictive features does not, in any circumstance, outweigh the harm that Plaintiff FAS suffered.

545.    As a direct and proximate result of the foregoing acts and practices, Defendant has received, or will receive, income, profits, and other benefits, which it would not have received if it had not engaged in the violations of the UCL described herein.

546.    As a direct and proximate result of Defendant's conduct, Plaintiff FAS sustained economic losses, including hundreds of dollars per year in video game related spending. Had Defendant not engaged in these fraudulent and deceptive practices, Plaintiff would not have sustained the aforementioned economic injuries.

547.    As a result of Defendant's conduct, Plaintiff FAS sustained significant injuries.

548.    As such, in accordance with the provisions of the California Business and Professions Code §§ 17200 and 17203, Plaintiff requests that this Court enjoin Defendant from continuing to violate the UCL or violating it in the same fashion in the future, and from continuing to conduct business via the unfair and fraudulent business acts as set forth in this Complaint.

## **PRAYER**

WHEREFORE, Plaintiff prays for judgment against each Defendant as to each relevant cause of action as follows:

1.        For Plaintiff FAS's general damages, including pain and suffering and emotional distress, according to proof at the time of trial;

2.        For Plaintiff FAS's past and future economic and special damages according to proof at the time of trial;

3.        For Plaintiff FAS's medical and related expenses according to proof at the time of trial;

4.        For Plaintiff FAS's prejudgment interest according to proof, pursuant to California Civil Code § 3291 at the time of trial;

5.        For Plaintiff FAS's costs of suit herein;

6.        For Injunctive relief;

7.        For Attorneys' fees;

8.        For exemplary and/or punitive damages according to proof at the time of trial; and,

9.        For such other and further relief, whether at law or in equity, that this Court deems just and proper.

///

///

///

///

///

///

///

///

///

///

///

COMPLAINT FOR DAMAGES AND DEMAND FOR JURY TRIAL

DATED: April 8, 2025

**BRADLEY/GROMBACHER LLP**

*Kiley Grombacher*
Marcus J. Bradley, Esq.
Kiley L. Grombacher, Esq.

DATED: April 8, 2025

**AYLSTOCK, WITKIN, KREIS & OVERHOLTZ, PLLC**

s. Mary Liu

Attorneys for Plaintiff

## <u>DEMAND FOR JURY TRIAL</u>

Plaintiff hereby demands a trial by jury as to all of their claims so triable.

DATED: March April 8,  2025

**BRADLEY/GROMBACHER LLP**

*Kiley Grombacher*
Marcus J. Bradley, Esq.
Kiley L. Grombacher, Esq.